UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

BRUCE MORRIS,
    a/k/a "G,"

           Defendant.

24 Cr. 358 (JMF)

**GOVERNMENT'S POST-HEARING BRIEF
AND SENTENCING SUBMISSION**

JAY CLAYTON
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Camille L. Fletcher
Matthew Weinberg
Assistant United States Attorneys
    *Of Counsel*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................ 1

APPLICABLE LAW ......................................................................................................... 4

ARGUMENT ..................................................................................................................... 5

I.     The Court Should Find that Because the Defendant Killed a Victim Under Circumstances that Constitute First Degree Murder, § 2A1.1 Applies ...................................................... 5

A.     The Evidence at Trial Established that the Defendant Murdered Sal ................................ 5

i.     An Eyewitness Saw the Defendant Shoot Sal ............................................................... 6

ii.     A Witness Observed a Dispute Between the Defendant and Sal on the Day of the Murder, and Encountered the Defendant after the Murder ............................................. 7

iii.     Other Witness Testimony Corroborates the Accounts of Simmons and Saleh ................. 8

1.     A Witness Observed the Defendant with Firearms and Saw the Defendant Leaving 868 Faile St. Immediately After the Shooting .................................................................... 9

2.     A Witness Bought Heroin from the Defendant, Sal, and Other Conspirators on Numerous Occasions, and Witnessed an Argument Between Sal and the Defendant about Money . 10

3.     Detective Zafar Received a Tip from Saleh On the Day of the Shooting, and Had Previously Arrested Sal With Crack and Heroin Nearby the Deli ................................... 10

iv.     Other Non-Witness Evidence Corroborates the Witness Accounts ................................. 11

1.     Call Logs ................................................................................................................. 11

2.     Video Surveillance Footage ...................................................................................... 13

3.     Ballistics Evidence .................................................................................................. 13

4.     Forensic Evidence ................................................................................................... 14

B.     Additional Evidence Introduced at the Hearing Further Establishes that the Defendant Murdered Sal .......................................................................................................... 15

i.     The Defendant's 2016 Custodial Statement ............................................................... 15

ii.     The Defendant's 2024 Post Arrest Statement ............................................................ 16

iii.     Beharovic's Testimony and August 8, 2016 Medical Records ...................................... 17

iv.    Testimonial Stipulation of Detective Zafar ........................................................... 17

v.    Diana Gonzalez ........................................................................................................ 18

C.    The Defendant's Killing of Sal Constitutes First Degree Murder ...................... 19

II.    The Relevant Drug Weight Is At Least 8,060 Grams of Heroin and 1,300 Grams of Cocaine Base ............................................................................................................ 20

A.    The Heroin Calculation ............................................................................................. 20

B.    The Cocaine Base Calculation ................................................................................... 21

C.    The Court Should Apply the Two Point Enhancements at § 2D1.1(b)(12) and 2D1.1(b)(16)(E) and Four Point Leadership Enhancement ................................ 22

III.    The Court Should Impose a Guidelines Sentence of 324 Months ...................... 23

CONCLUSION ............................................................................................................... 25

# PRELIMINARY STATEMENT

The Government respectfully submits this brief in connection with the sentencing of Bruce Morris, a/k/a "G" (the "defendant").  Indictment S2 24 Cr. 358 (JMF) charged the defendant in four counts in connection with (i) his leadership of a narcotics conspiracy that operated inside and in the vicinity of an apartment building located at 868 Faile Street in the Bronx, New York, (ii) his possession, use, and brandishing of firearms in furtherance of that conspiracy, and (iii) the August 11, 2016 drug-related murder of victim Jerome Jemison, a/k/a "Sal."  Specifically, the indictment charged:

- Count One (21 U.S.C. § 848(e)(1)(A)):  On August 11, 2016, while engaging in an offense punishable under 21 U.S.C. § 841(b)(1)(A), specifically, the narcotics conspiracy charged in Count Four, the defendant murdered Jerome Jemison, a/k/a "Sal," in the vicinity of 868 Faile Street, Bronx, New York.

- Count Two (18 U.S.C. § 924(j)(1)):  On August 11, 2016, during and in relation to the narcotics conspiracy charged in Count Four, the defendant murdered Jerome Jemison, a/k/a "Sal," in the vicinity of 868 Faile Street, Bronx, New York.

- Count Three (18 U.S.C. § 924(c)(1)(A)(i), (ii), and (iii), and 2):  From 2014 through at least 2023, during and in relation to the drug trafficking crime charged in Count Four, the defendant knowingly used and carried a firearm, and in furtherance of such crime, possessed a firearm, and aided and abetted the use, carrying and possession of a firearm, which as brandished and discharged.

- Count Four (21 U.S.C. § 846):  From 2014 through at least 2023, the defendant conspired to distribute and possess with intent to distribute (i) 280 grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," and (ii) 1 kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(b)(1)(A).

A jury trial commenced on Monday, January 13, 2025.  The parties rested on Thursday, January 16, 2025.  On Friday, January 17, 2025, the jury heard summation arguments, received

the Court's instructions, and began deliberating.  On Tuesday, January 21, 2025,[1] the jury returned

a partial verdict of guilty with respect to Counts Three and Four.[2]  With respect to Count Three,

the jury found that the defendant had brandished the firearm that he possessed, but did not answer

the special question as to whether the defendant had discharged the firearm that he possessed.

With respect to Count Four, the jury did not answer either of the special questions regarding the

weight of the narcotics distributed and possessed with intent to distribute.  On Wednesday, January

22, 2025, after the jury reported that it remained deadlocked on the outstanding counts and

questions, the Court declared a mistrial with respect to the remaining counts and questions.

A retrial was scheduled to commence of February 25, 2025.  However, on February 20,

2025, with the parties' consent, the Court dismissed all open counts, obviating the need for another

trial, and proceeding to sentencing on the counts of conviction.

The parties have a dispute regarding the offense conduct contained in the Presentence

Investigation Report ("PSR") as well as the application of the United States Sentencing Guidelines

("U.S.S.G.") to the counts of conviction.  Specifically, the Government claims – consistent with

the PSR – that, pursuant to U.S.S.G. § 2D1.1(d)(1), since the defendant killed a victim under

circumstances that constitute first degree murder, the guidelines at U.S.S.G. § 2A1.1 should apply,

resulting in a base offense level of 43.  The defense disputes that the defendant committed first

degree murder.  The Government further contends that the defendant should be held responsible

---

[1] The jury did not deliberate over the weekend or on Monday, January 20, 2025, which was the
Martin Luther King, Jr. Day holiday.

[2] The Court reversed the order of the counts for the jury, such that Count Four of the Indictment
became Count One and Count Three of the Indictment became Count Two.  In this submission,
the Government refers to the counts as they were charged in the Indictment.

for distributing approximately 8,060 grams of heroin and 1,300 grams of cocaine base.  The defense disputes the calculation of the drug weight.[3]

On June 18, 2025, the Court heard testimony and received other evidence relating to these two disputes at a hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979).

The evidence introduced at the trial and the additional evidence introduced at the *Fatico* hearing proved by a preponderance of the evidence that the defendant committed first-degree murder and that the defendant conspired to distribute and possess with intent to distribute 8,060 grams of heroin and 1,300 grams of cocaine base.  Therefore, the PSR's factual recitation pertaining to the murder and drug weight is accurate, and the PSR's calculation of an offense level of 43 with respect to Count Four is correct.[4]  Since the defendant is in Criminal History Category III, the resulting Guidelines range with respect to Count Four is 240 months' imprisonment.  In addition, the Guidelines sentence for Count Three is 84 months' imprisonment, which must run consecutively to any other term of imprisonment.  The total Guidelines sentence is 324 months' imprisonment, with a mandatory minimum term of 84 months' imprisonment.[5]

---

[3] The defense has not challenged the application of a four-level adjustment for the defendant's role in the offense pursuant to § 3B1.1(a), specifically, that the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.  (PSR ¶ 48).

[4] Because the offense level with the four-point enhancement pursuant to 3B1.1(b) is 47, and therefore above 43, the offense level is treated as an offense level of 43.  *See* U.S.S.G. § 5A, Application Note 2.

[5] If the Court were to conclude that the defendant did not murder Sal, the offense level for Count Four should be 42.  Specifically, if the Court finds that the narcotics conspiracy involved 8,060 grams of heroin and 1,300 grams of cocaine base, this results in a converted drug weight of 12,702.3 kilograms and a base offense level of 34, *see* U.S.S.G. §§ 2D1.1, Application Note 8(D), 2D1.1(a)(1), and 2D1.1(c)(3).  In addition, the Court should apply a two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(12) because the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, as well as a two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(16)(E) because the defendant receives an aggravating role adjustment under § 3B1.1 and because the defendant committed the offense as part of the pattern

The Court should impose the Guidelines sentence of 240 months' imprisonment on Count Four, to be followed by a mandatory consecutive sentence of 84 months on Count Three.

## APPLICABLE LAW

The Government bears the burden of showing by a preponderance of the evidence that the defendant murdered Sal and that the defendant conspired to distribute and possess with intent to distribute the relevant drug weight. *See United States v Salazar*, 489 F.3d 555, 558 (2d Cir. 2007) ("[W]e conclude that the district court was required to use the preponderance of the evidence standard…in finding facts relevant to sentencing for Guidelines calculation purposes"); *United States v. Gaskin*, 364 F.3d 438, 461 (2d Cir. 2004) (burden of proof for facts considered at sentencing is "by a preponderance of the evidence"); *United States v. Moayedi*, No. 22 Cr. 188 (JSR), 2023 WL 8471845 at *2 (S.D.N.Y. Dec. 7, 2023) (finding that defendant intentionally provided inadequate construction in numerous contracts by preponderance of the evidence).

The federal murder statute defines murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111. As relevant here, a "willful, deliberate, malicious, and premeditated killing," or a killing "perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree." *Id.* "Any other murder is murder in the second degree." *Id.* Therefore, the difference

---

of criminal conduct engaged in as a livelihood. In addition, the Court should apply a four-level enhancement, pursuant to §3B1.1(a), because the defendant was an organizer or leader of an offense which involved five or more participants or was otherwise extensive.

The resulting Guidelines range on Count Four would be 360 months' to life imprisonment. However, because the statutory maximum sentence for Count Four is 240 months' imprisonment, pursuant to U.S.S.G. § 5G1.1(a), the applicable Guidelines range for Count Four is 240 months' imprisonment. The Guidelines Sentence for Count Three is 84 months' imprisonment, which must run consecutively to any other term of imprisonment imposed. Accordingly, even if the Court did not conclude that the defendant murdered Sal, the total Guidelines sentence is 324 months' imprisonment, with a mandatory minimum sentence of 84 months' imprisonment.

between first degree murder and second degree murder is that only first degree murder requires premeditation. *See United States v. Guerrero*, 52 F. Supp. 3d 643, 652 (S.D.N.Y. 2014); *see also United States v. Delaney*, 717 F.3d 553, 556 (7th Cir. 2013) ("The only difference between the two degrees of murder, sharing as they do the requirement that the murderer have acted with 'malice aforethought,' is…that a first-degree murder…must be 'premediated.'").

## ARGUMENT

## I.    The Court Should Find that Because the Defendant Killed a Victim Under Circumstances that Constitute First Degree Murder, § 2A1.1 Applies

The Government has established that the defendant killed Sal under circumstances that constitute first degree murder. Therefore, pursuant to § 2D1.1(d)(1), the Court should apply the first-degree murder Guideline at § 2A1.1, and a base offense level of 43.

There is no serious dispute that (i) Sal was shot and killed at approximately 1:25 p.m. on August 11, 2016 inside 868 Faile Street, (ii) after being shot, Sal's body landed on the staircase landing between the second and third floors of 868 Faile Street, and (iii) Sal thereafter died at the hospital as a result of the shooting.[6] Both at trial and at the hearing, the Government established by at least a preponderance of the evidence that the defendant committed the murder.

### A.    The Evidence at Trial Established that the Defendant Murdered Sal

The evidence at trial, even without the additional evidence adduced at the *Fatico* hearing, was sufficient to establish by a preponderance of the evidence that the defendant murdered Sal. That evidence included, among other things, the testimony of four civilian witnesses who each knew Sal and the defendant, including (i) an eyewitness who observed the murder through the

---

[6] The defendant objects to the inclusion of all paragraphs in the PSR which refer to the murder. However, the Government does not understand the defendant to be contesting that Sal's death was the result of a gunshot wound suffered on August 11, 2016, and/or that Sal was shot that day inside of 868 Faile Street.

peephole of her apartment, located on the third floor of 868 Faile Street, and identified the defendant as the shooter; (ii) a witness who worked at a nearby deli who routinely saw the defendant and Sal engaged in drug transactions, observed the defendant and Sal in a verbal dispute shortly before the murder, and heard the defendant make an incriminating statement shortly after the murder; (iii) a witness who worked as the superintendent of 868 Faile Street and encountered the defendant immediately after the murder and otherwise testified to the defendant's participation in drug sales and possession and brandishing of firearms, and (iv) a witness who purchased heroin from the defendant and his co-conspirators, including Sal, on countless occasions, and who had observed the defendant and Sal arguing about money prior to the murder.  These witness accounts were corroborated by surveillance video, call logs, forensic, ballistic, and medical evidence, and the testimony of law enforcement officers.

### i.  An Eyewitness Saw the Defendant Shoot Sal

Illia Simmons testified that she saw the defendant shoot Sal.  (Tr. 113).  Specifically, Simmons testified that she lived across the hall from the defendant's family's apartment on the third floor of 868 Faile Street.  (Tr. 113).  Simmons had known the defendant since at least 2013.  (Tr. 162; 12-18).  Simmons had an addiction to crack cocaine, and regularly bought the drug from the defendant and his co-conspirators inside 868 Faile Street.  (Tr. 162).

On the day of the murder, Simmons was home with her young daughter when she heard an argument that drew her to the door at the entrance of her apartment.  (Tr. 120, 124).  Upon walking to her entrance door, Simmons looked through the peephole and saw the defendant.  As Simmons looked through the peephole, Simmons heard Sal say, "I don't have the money for the bundle," which Simmons understood to be a reference to heroin.  (Tr. 120, 121).  After Sal said this to the defendant, Simmons observed the defendant fire a shot with a firearm that Simmons believed to

be a revolver.  (Tr. 121-122).  After the defendant shot Sal, Simmons backed away from the peephole and heard the door to the defendant's family's apartment slam shut.  (Tr. 122).

On the day of the murder, Simmons told detectives from the New York City Police Department ("NYPD") that she did not see anything.  (Tr. 133).  Simmons testified that she told this lie to the NYPD because she was "afraid" and "scared."  (Tr. 133-134).  In 2022, Simmons reported what she saw that day to NYPD officers at the police precinct after Simmons was arrested for menacing following a dispute with a neighbor which resulted in Simmons calling the police. (Tr. 134).  Simmons testified that she decided to report what she saw because she had been "feeling so guilty for not saying anything in the first place" and she was "upset" about what happened to Sal.  (Tr. 134).  Simmons further testified that she did not believe telling the police about what happened to Sal would assist her with her arrest, because she knew that she had not been in the wrong in connection with the dispute with her neighbor.  (Tr. 134-135).  Indeed, the charges against Simmons were dismissed.  (Tr. 189).

### ii.  A Witness Observed a Dispute Between the Defendant and Sal on the Day of the Murder, and Encountered the Defendant after the Murder

David Saleh testified that, on the day of the murder, he was working at a deli located on the southeast corner of Hunts Point Avenue and Gilbert Place (the "Deli"), around the corner from 868 Faile Street.  (Tr. 199-201).  Saleh worked at the Deli approximately 12 hours per day during that period of time, and regularly saw the defendant and Sal engaging in drug transactions.  (Tr. 202, 207).  On one occasion prior to the murder, Saleh observed the defendant with a firearm.  (Tr. 208).  Saleh also had communications with the defendant about the defendant's drug dealing, including arguments about whether the defendant could sell near the Deli, and one communication in which the defendant suggested that Saleh should sell drugs on behalf of defendant.  (Tr. 210).

On the day of the murder, Sal and the defendant were both in the Deli. Saleh testified that Sal appeared "high." (Tr. 211; 25 – 212; 1-4 ("[H]e was high…[H]e was kind of like sleepy, though, like in and out like, sleepy."). Saleh recalled that the defendant said to Sal, "[o]h, you look high…. [y]ou look high, though. Where's my money, though." (Tr. 215; 11-12). Sal responded, in part, "when I get money, I'm going to give it to you." (Tr. 216; 11-12). The defendant responded, "you've got money. I need my money today. If I don't get my money, I'm going to blow your head off." (Tr. 216; 21-22). Sal responded, "when I get money, I'm going to give it to you. You, pussy. You're not doing anything." (Tr. 217; 6-7).[7] Saleh testified that Sal then left the store. (Tr. 217; 13-15, 19-20). After Sal left the store, the defendant stated, "he think I'm playing with him. I need my money today. If I don't get my money today, I'm going to blow his head off." (Tr. 218; 4-8; *see also* Tr. 218; 9-10 ("Q. Who was he talking to when he said that? A. He was talking loud in the store like this.")). Approximately "fifteen minutes to ten minutes" later, (*see* Tr. 219; 7), the defendant returned to the store and demanded that Saleh give him a cigarette, stating: "Give me a cigarette. Give me a cigarette. I tell him, I'm going to blow his head off. So, he think I'm playing." (Tr. 219; 7-12). Saleh provided the defendant with a cigarette. Around the same time that the defendant returned to the Deli, Saleh learned that someone had been shot. Saleh later learned that Sal was the victim of the shooting. (Tr. 201).

### iii. Other Witness Testimony Corroborates the Accounts of Simmons and Saleh

The accounts of Simmons and Saleh were corroborated by the witness testimony of at least two other civilian witnesses and at least one other law enforcement witness. They were also

---

[7] When asked to repeat this for clarity, Saleh testified that Sal said: "[W]hen I get the money, I will give it to you. You not doing nothing, you piece of shit, you pussy."

corroborated by objective non-witness testimony, such as call logs, video surveillance, and medical records, as discussed further below.

> 1. **A Witness Observed the Defendant with Firearms and Saw the Defendant Leaving 868 Faile St. Immediately After the Shooting**

Wilfredo Rivera worked as the superintendent of 868 Faile Street beginning in or about July 2015, including at the time of the murder. (Tr. 300). Rivera testified that, on the day of the murder, he was inside his residence on the second floor of 868 Faile Street when he heard a gunshot. (Tr. 296-297; 350). After hearing the gunshot, Rivera immediately exited his apartment and saw Sal lying on stairs between the second and third floor. (Tr. 297, 350-351). Rivera then called 911. Shortly thereafter, he saw the defendant exit his apartment and heard Rivera shout, "Sal got shot, Sal got shot." (Tr. 352; 25). The defendant then stepped over Sal, went down the stairs and exited the building. (Tr. 352, 353).

Rivera also testified to the defendant's possession and use of firearms to protect his drug dealing business. For example, Rivera testified that, in or about July 2015, shortly after he began working as the superintendent at 868 Faile Street, the defendant threatened Rivera with a firearm. (Tr. 332, 334). Specifically, Rivera testified that he had gone to check on an otherwise vacant apartment located on the fourth floor of 868 Faile Street, which the defendant and his co-conspirators had been using to sell drugs. (Tr. 305). Rivera knocked on the door of the apartment and announced himself as the superintendent of the building. Rivera heard people inside of the apartment, but no one responded to his knock on the door. Thereafter, Rivera entered the apartment through the fire escape. Rivera observed three people in the apartment, and saw two handguns on a table next to a white powdery substance that appeared to be cocaine. (Tr. 306, 329, 330). A minute or two later, the defendant entered the apartment (through the locked door, to which the defendant had access) and threatened Rivera. Specifically, Rivera testified that the

defendant said to him, "what the F you doing here? You know that you can die here, you know? You good as dead." (Tr. 331; 15-16). When the defendant threatened Rivera, the defendant had a firearm in his waistband. (Tr. 332).

### 2. A Witness Bought Heroin from the Defendant, Sal, and Other Conspirators on Numerous Occasions, and Witnessed an Argument Between Sal and the Defendant about Money

Mifit Beharovic testified that he was a long-time heroin user who had purchased the drug from the defendant's co-conspirators, including Sal, on countless occasions. Beharovic testified that Sal specifically told Beharovic that Sal was selling drugs on behalf of the defendant. (Tr. 453). Beharovic estimated that Sal told him about selling drugs for the defendant in approximately 2016, "right around before he died." (Tr. 453; 18-22). Beharovic also testified that, in the two or three weeks before Sal's death, Beharovic observed an incident in which Sal and the defendant were arguing in the lobby of 868 Faile Street. (Tr. 436; 19-25, 454; 4-23). Beharovic recalled that the argument was about money, and specifically that the defendant "said he want his money" and Sal said "he don't have it, [the defendant] got to wait." (Tr. 454; 16-18).

### 3. Detective Zafar Received a Tip from Saleh On the Day of the Shooting, and Had Previously Arrested Sal With Crack and Heroin Nearby the Deli

Detective Zafar is a field intelligence officer ("FIO") for the 41st police precinct, which includes 868 Faile Street and the surrounding area. Before he was an FIO, Detective Zafar worked in various other positions at the NYPD, including as a street narcotics officer beginning in 2015. Detective Zafar was still working as a street narcotics officer at the time of the murder.

Detective Zafar testified, among other things, that on or about March 9, 2016, he observed Sal engaged in a hand-to-hand narcotics transaction in the vicinity of 848 Hunts Point Avenue, just south of the corner of Hunts Point Avenue and Gilbert Place. Detective Zafar placed Sal under arrest, and found Sal to be in possession of heroin, crack cocaine, and marijuana. (Tr. 478).

Specifically, Sal was carrying heroin packaged in glassine envelopes, and crack cocaine packaged in a ziplock bag.  (Tr. 479; 5-6).  This testimony corroborates Saleh's testimony that he regularly saw Sal and the defendant in and around the Deli and engaging in narcotics transactions.  It also corroborates the testimony of Beharovic, who stated that he purchased heroin from Sal.[8]

Detective Zafar also testified that, on the day of the murder, he responded to the scene at 868 Faile Street.  (Tr. 481; 11).  While at the scene, or later that day when he was back at the precinct, Detective Zafar was contacted by Saleh, who was a source of information for Detective Zafar.  Detective Zafar recalled that Saleh "stated that he knew who committed the murder," and that "G was the one responsible."  (Tr. 482; 12-17; 24-25).  This is powerful evidence corroborating Saleh, who reported what he knew about the murder to an NYPD contact on the same day as the murder.

### iv.  Other Non-Witness Evidence Corroborates the Witness Accounts

In addition to the witness testimony, the Government introduced significant objective evidence at trial.  This evidence both independently supports the conclusion that the defendant murdered Sal, and, just as critically, corroborates the civilian witness testimony, particularly the testimony of Simmons and Saleh.

### 1.  Call Logs

At trial, the Government introduced call logs reflecting the communications between the defendant and Sal in the days leading up to the murder.  (*See* Tr. 637-644 (Testimony of Anna Gamboa); *see also* GX 1201 (chart listing contacts between Sal and the defendant from August 6,

---

[8] As discussed below in connection with the evidence at the *Fatico* hearing, Detective Zafar also recalled an instance within a year of Sal's death during which Sal told Detective Zafar that he had been selling drugs for the defendant and that he owed the defendant money. *See* GX FATICO S-1 (Stipulation of Testimony of Detective Ahsan Zafar).

2016 through August 11, 2016); GX 1202 (chart summarizing the contacts identified in GX 1201)).
The call logs reflect that, between August 6, 2016 and August 11, 2016, there were 86 contacts
between the defendant and Sal, summarized as follows:

| Date | Calling Number | Called Number | Frequency |
|------|---------------|---------------|-----------|
| August 6, 2016 | (347) 834-4233[9] | (718) 924-0571)[10] | 22 |
| | (718) 924-0571) | (347) 834-4233 | 2 |
| August 7, 2016 | (347) 834-4233 | (718) 924-0571) | 9 |
| | (718) 924-0571) | (347) 834-4233 | 1 |
| August 8, 2016 | (347) 834-4233 | (718) 924-0571) | 40 |
| | (718) 924-0571) | (347) 834-4233 | 3 |
| August 9, 2016 | (347) 834-4233 | (718) 924-0571) | 3 |
| | (718) 924-0571) | (347) 834-4233 | 0 |
| August 11, 2016 | (347) 834-4233 | (718) 924-0571) | 1 |
| | (718) 924-0571) | (347) 834-4233 | 5 |

*See* GX 1202.

On the day of the murder, that is, August 11, 2016, there were six calls between the
defendant and Sal. The first call, which lasted approximately 31 seconds, was placed by the
defendant to Sal at approximately 12:42 p.m. Sal then attempted to contact the defendant five
times between 1:03 p.m. and 1:07 p.m., specifically at 1:03:54 p.m., 1:53:59 p.m., 1:04:06 p.m.,
1:04:48 p.m., and 1:07:17 p.m. These calls lasted two to four seconds each; it is possible that they

---

[9] This is the phone number for Sal. (*See* GX S-3.)

[10] This is the phone number for the defendant. (Tr. 255)

were not connected. The murder took place at approximately 1:25 p.m. These call logs demonstrate that, in the final minutes of his life, Sal and the defendant were calling each other – thus establishing that the defendant was one of the final people with whom Sal communicated before he was shot. This is also consistent with the accounts of Saleh, who observed Sal and the defendant in an argument shortly before the murder, and of course with the account of Simmons, who observed Sal and the defendant arguing about money for bundles immediately before the murder.

### 2. **Video Surveillance Footage**

Video surveillance footage introduced at trial showed the defendant and his brother entering an apartment at 743 Hunts Point Avenue – approximately two blocks away from 868 Faile Street – approximately fourteen minutes after the murder at 1:39:31 p.m. This corroborates the testimony of Rivera, who stated that the defendant left 868 Faile Street immediately after the murder, as well as the testimony of Saleh, who stated that the defendant was in the Deli shortly after the shooting. The defendant had more than enough time to stop at the Deli before proceeding to 743 Hunts Point Avenue.

### 3. **Ballistics Evidence**

The evidence at trial established that no shell casings were found at the scene of the murder. (*See* Tr. 103 (Testimony of Sgt. Wayne Darden); Tr. 251 (Testimony of Det. Matthew McCrosson). At trial, the Government also called NYPD Detective Matthew Brady as an expert in operability, microscopy, and ballistics evidence generally. (Tr. 620; 16-25 – 621; 1-2). Detective Brady explained that revolvers do not eject shell casings when fired. (Tr. 624; *see also* Tr. 275 (Testimony of Detective McCrosson).

This testimony is significant in light of Simmons's testimony that she believed the firearm used by the defendant to shoot Sal was a revolver. (Tr. 121; 25 – 122; 1-2). Not only is the

apparent use of a revolver consistent with Simmons's testimony, but it is especially corroborative of Simmons because there would have been no way for Simmons to know that a revolver was used in the murder if Simmons had not personally observed the firearm during the shooting. Furthermore, if Simmons was lying about observing the shooting, Simmons would have been unnecessarily embellishing by stating that she believed the firearm was a revolver, since that statement could have been easily disproved if shell casings were found at the scene. Simmons could have just as easily said that she was not sure the type of firearm that was used. Instead, she reported that she believed she observed a revolver, because the defendant had used a revolver to murder Sal, leaving no shell casings behind.

### 4. Forensic Evidence

Dr. Kara Storck, Medical Examiner at the New York City Office of the Chief Medical Examiner, testified at trial that Sal's death was a homicide by gunshot wound. (Tr. 656, 658). Notably, however, Dr. Storck further testified that, based on the location where the bullet fragments were lodged, it was her view that the muzzle of the firearm at the time of the shooting would have been aligned to the back left side of Sal's head. (Tr. 656).

Similar to the ballistics evidence regarding the revolver, Dr. Storck's testimony is critical not only because it confirms the Government's theory of the murder – that is, that the defendant fired on Sal while the defendant was standing on the third floor landing of 868 Faile Street outside of Simmons's apartment, and Sal was at or near the top of the staircase, starting to walk away from the defendant – but also because it is highly corroborative of Simmons. Again, there is no way that Simmons would have known that the shooter was standing directly outside her apartment at the time of the shooting if Simmons did not observe the shooting. And, if Simmons did not observe the shooting and was lying, that lie would have been easily disproved if the bullet that killed Sal

had entered his body in a manner inconsistent with the shooting taking place outside of Simmons's apartment. Therefore, the forensic evidence, similar to the ballistics evidence, is highly probative and highly corroborative of Simmons.

**B.    Additional Evidence Introduced at the Hearing Further Establishes that the Defendant Murdered Sal**

At the *Fatico* hearing, the Government introduced additional evidence establishing that the defendant murdered Sal. Specifically, the Government introduced (i) the testimony of Beharovic, who noted that, close in time to the murder, Beharovic observed Sal with stiches on his head, which Sal reported to Beharovic was the result of an altercation with the defendant; (ii) Sal's medical records from August 8, 2016 – a few days before the murder – are consistent with the injuries described by Beharovic; (iii) a testimonial stipulation of Detective Zafar, which stated that Detective Zafar recalled an incident within a year of Sal's death during which Sal told Detective Zafar that Sal had been selling drugs on behalf of the defendant, but that Sal owed the defendant money and planned to get out of the drug business; (iv) the testimony of Detective Matthew McCrosson, who testified to a custodial statement made by the defendant on August 11, 2016, the day of the murder; (v) the testimony of an ear witness ("Gonzalez") who heard an altercation between the defendant and the victim prior to the murder; (vi) Morris's 2024 post arrest statement, which places him at the murder scene and corroborates the timeline and other relevant aspects of the witness testimony.

### i.    The Defendant's 2016 Custodial Statement

On the day of the murder, Morris was arrested for a parole violation and interviewed by law enforcement officers. During that interview Morris admitted that he sold drugs in the neighborhood, and that Sal sold drugs for him. These statements corroborate the trial testimony from the civilian witnesses and Detective Zafar. (GX FATICO-6). Morris also told the officers

that he had spoken to the victim about an hour before the murder, and that the victim had asked him for drugs to sell. This was consistent with the testimony of the civilian witnesses who noted that Sal sold drugs on behalf of the defendant, and that Sal and the defendant were arguing about money owed for drugs on the day of the murder. The defendant also admitted to officers that he was present at the scene shortly after the murder and that he saw the victim laying in the hallway shot. Critically, the defendant offered his view of the motive for the victim's murder. He told the officers that the victim was known for messing up drug work because of the victim's drug habit, and that maybe the victim had been shot for messing up someone's drug work. (GX FATICO-6). Again, these statements corroborate the civilian trial witnesses' testimony that the defendant and Sal had been in a dispute about drug money. Indeed, given the fact that the record contains evidence of Sal selling drugs for only one dealer—the defendant—his statements are all the more powerful proof of his perpetrating the murder with the context of the other facts before the Court.

### ii. The Defendant's 2024 Post Arrest Statement

The defendant's own statements in his 2024 post-arrest, *Mirandized* interview also established crucial facts that demonstrate that he murdered Sal. First, the defendant admitted that he was speaking to the victim about "dope" (in other words, heroin) and money near 868 Faile Street about an hour before the murder. (GX FATICO-4-T at 56, 76-78). The defendant also admitted that he was present at 868 Faile Street at the time of the murder. (GX FATICO-4-T at 42, 51). And the defendant admitted to being present in the hallway immediately after the murder. (GX FATICO-4-T at 42, 44, 56). Each of these admissions corroborate the witness testimony about the defendant's whereabouts and activity on the day of the murder – i.e., that he was arguing with Sal about drug money prior to the murder, that he shot Sal inside 868 Faile Street, and that he then fled from the third floor of the building.

16

### iii. **Beharovic's Testimony and August 8, 2016 Medical Records**

Beharovic also testified at the *Fatico* hearing.  Beharovic testified to a conversation that Beharovic had with Sal that, "to [Beharovic's] recollection," occurred "about a week or two before [Sal] passed away."  (Hearing Tr. 7; 11-12).  Beharovic testified that he observed Sal with stiches on his head, and that Sal stated that "he was jumped by [the defendant] and his crew" and "got hit by a brick in his head."  (Hearing Tr. 6; 19-24).  Sal asked Beharovic if Beharovic had a firearm that Sal could have for his protection, but Beharovic did not provide him with any firearm. (Hearing Tr. 6; 25 – 7; 1-5).

At the *Fatico* hearing, the Government also introduced Sal's medical records from August 8, 2016 – three days before the murder.  (GX FATICO-2).  Those records indicate that, on August 8, 2016, Sal was transported to Lincoln Medical Center via EMS, where he was treated for a "laceration to the head."  (*See id.* at 3 ("Arrived By: EMS," "Patient Complaint(s):  Small lacerations to the right side of head," "Chief Complaint(s):  Laceration to the head)").  These medical records are consistent with Beharovic's testimony that Sal was jumped and hit with a brick shortly before the murder, and that Sal had a noticeable injury on his head as a result.[11]  They too are powerful proof that the rug dealer with whom Sal had conflict in the weeks, days, hours, and seconds before his death was the defendant.

### iv. **Testimonial Stipulation of Detective Zafar**

At the hearing, the Government introduced a testimonial stipulation of Detective Zafar. (GX FATICO-S-1).  In that stipulation, Detective Zafar stated that, during an interaction with Sal which occurred within a year of Sal's death, Sal informed Detective Zafar that he had been selling

---

[11] At the hearing, Beharovic testified that Sal told Beharovic about the brick incident "about a week or two" before Sal's death.  The medical records reflect that Sal visited the hospital due to the laceration on August 8, 20016 – three days before his death.

drugs on behalf of the defendant, but that "Sal owed money to" the defendant. (GX FATICO-S-1 ¶ 3). This corroborates the witness testimony that Sal and the defendant had been fighting about money before Sal's death, and it strengthens the inference that the drug dealer to whom Sal owed money that the defendant referenced in his 2016 custodial interview was himself.

v. **Diana Gonzalez**

Diana Gonzalez testified at the Fatico hearing that she was home in her fourth-floor apartment at 868 Faile Street on the day of the murder.[12] (Hearing Tr. 27). Around 1:25 p.m., Gonzalez was cleaning her apartment with the door open when she heard two people arguing. (Hearing Tr. 27-28). Gonzalez recognized one of the voices in the argument as the voice of a person known to her as "G" – a nickname for the defendant. (Hearing Tr. 28-29). Gonzalez heard the other person in the argument say, "I'm going to get you your money." (Hearing Tr. 28). At the hearing, Gonzalez testified that, after hearing the argument between G and the unknown individual, she heard G's door close, and that approximately 30 or 45 minutes later, she heard the gunshot. However, at prior meetings with the Government and law enforcement agents – the notes of which were introduced into the record at the hearing – Gonzalez told law enforcement that the shooting occurred in the moments after the argument. Specifically, Gonzalez stated, during at least two meetings with the NYPD and one additional meeting with the NYPD, FBI, and attorneys from the U.S. Attorney's Office, in sum and in substance, that she heard G yelling and arguing with someone on the third floor of 868 Faile Street, that she then heard the person arguing with G say, in sum and substance, "I am going to give you your money," and that things got quiet for a

---

[12] Gonzalez was served with a court subpoena in advance of the trial, but failed to appear at the trial. She was then served with two additional subpoenas in advance of the hearing and had indicated that she would not appear pursuant to the subpoenas. Ultimately, Gonzalez testified only after she was arrested pursuant to a material witness warrant.

moment before she heard a loud bang, which she later learned was a gunshot.  (3511-05 at 2, 3511-29 at 1, 3511-27 at 1, and 3511-28).

Gonzalez's out of court statements to law enforcement are damning evidence:  she is a second percipient witness who heard Sal and the defendant fighting immediately before the lethal shot was fired.  And it is these statements—made on three separate occasions, closer in time to the events of August 11, 2016, and outside of the presence of the defendant – that the Court should credit as truthful.  In light of Gonzalez's repeated insistence that she would not willingly testify against the defendant, her refusal to comply with multiple court subpoenas, and the fact that she only testified after being arrested, the Court should conclude that Gonzalez's changed story on the witness stand was an effort to minimize the inculpatory nature of her testimony.  That said, even Gonzalez's in-court testimony is significant evidence of the defendant's guilt, since it places the defendant in a loud argument during which the other participant said he was going to get the defendant his money on the same day as the murder – entirely consistent with the testimony of other witnesses.

### C.    The Defendant's Killing of Sal Constitutes First Degree Murder

If the Court concludes that the defendant killed Sal, it follows that the murder was premeditated, first degree murder.  As the above evidence makes clear, the defendant murdered Sal after a long-running dispute over money.  A few days before the murder, the defendant and his crew assaulted Sal with a brick.  (Hearing Tr. 6).  On the day of the murder, the defendant even warned Sal that if the defendant did not receive his money "*today*," the defendant was "going to blow [Sal's] head off."  (Tr. 216; 21-22).  The defendant's killing of Sal constitutes first degree murder.

## II.    The Relevant Drug Weight Is At Least 8,060 Grams of Heroin and 1,300 Grams of Cocaine Base

As stated in the PSR, *see* ¶ 38, the defendant should be held responsible for 8,060 grams of heroin and 1,300 grams of cocaine base. To the extent the Court does not conclude that the defendant murdered Sal, which he did, the applicable Guidelines range should be determined in the first instance by the applicable drug weight.  Since there were two drugs relevant to the conviction, heroin and cocaine base,[13] the Court should apply the Drug Equivalency Tables pursuant to U.S.S.G. § 2D1.1, Application Note 8(B).

### A.  The Heroin Calculation

With respect to heroin, the defendant should be held responsible for approximately 8,060 grams.  At trial, Inspector Al Hernandez of the New York City Department of Investigation Health and Hospitals Office of the Inspector General, testified as an expert in the sale of narcotics and drug trafficking in the New York region.  (Tr. 571; 8-9; 577; 7-12).  Inspector Hernandez estimated that a typical bag containing an individual dose of heroin, commonly referred to as a "glassine," weighed about three-quarters of a grain.  (Tr. 584).  Therefore, 20 glassines would weigh approximately one gram.

Beharovic testified that, from 2010 to 2012, he purchased about 20 bags or "glassines" of heroin, about five days per week, from the defendant's drug crew in or around 868 Faile Street. Assuming that Beharovic purchased approximately 100 bags of heroin weighing an aggregate of

---

[13] The jury's verdict did not specify whether it concluded that the defendant had conspired to distribute and possess with intent to distribute only heroin, only cocaine base, or both.  For purposes of the Guidelines calculation, the Court should consider weight for both heroin and cocaine base, because the evidence easily establishes by a preponderance that the defendant conspired to distribute and possess with intent to distribute both substances, and all the drugs distributed as part of the narcotics trafficking conspiracy constitute relevant conduct in any event. *See* U.S.S.G. §1B1.3.

five grams of heroin each week for two years – that is, 104 weeks – that means that the defendant

is responsible for approximately 520 grams of heroin sold to Beharovic between 2010 and 2012.

Thereafter, between 2012 and 2023, Beharovic testified that he purchased approximately two bags

of heroin per day from 868 Faile Street, five days per week, for a total of 10 bags per week or 520

bags of heroin per year.  Assuming that Beharovic purchased in those amounts for eleven years

between 2012 and 2023, that would equate to 5,720 bags of heroin weighing approximately 286

grams.[14]  Therefore, between 2010 and 2023, Beharovic personally purchased approximately 806

grams of heroin from the defendant and his co-conspirators.  If the Court assumes that Beharovic

accounted for approximately 10% of the heroin sales in the conspiracy – no doubt a conservative

estimate, in light of the witness testimony at trial about the prevalence of drug sales by the

defendant and his co-conspirators – the total amount of heroin sold between 2010 and 2023 is

approximately 8,060 grams.

### B.  The Cocaine Base Calculation

With respect to cocaine base, or crack, Simmons testified that she and her partner spent

approximately $400 to $500 on (which amounts to 40 to 50 dime bags) crack per week from the

defendant and his co-conspirators for approximately 10 years, or 520 weeks.[15]  (Tr. 162-165).  This

means that Simmons and her partner purchased 20,800 to 26,000 dime bags from the defendant

---

[14] The time period between 2012 and 2023 is twelve years.  In its initial communications with Probation regarding the offense conduct and Guidelines calculation, the Government inadvertently only multiplied 520 by 11 for the years 2012 through 2023.  In order to arrive at a conservative estimate, and because there may have been months during the twelve years that Beharovic did not purchase heroin from the defendant, the Government is not seeking to increase the estimate beyond what is included in the PSR.

[15] Simmons actually testified that these purchases continued between approximately 2013 and approximately 2023, which is a period of 11 years.  Since it is difficult to identify the month in 2013 during which Simmons and her husband started purchasing drugs from the defendant and the month in 2023 during which Simmons stopped purchasing drugs from the defendant, the Government is conservatively calculating only 10 years of purchases.

and his co-conspirators in total.  Inspector Hernandez testified that an average dime bag of crack weighed approximately 1/16 of a gram. (Tr. 589).  Therefore, in a ten-year period, Simmons and her husband alone purchased approximately 1,300 to 1,625 grams of crack from the defendant. Assuming that Simmons and her husband accounted for 10% of crack sales by the defendant and his co-conspirators – again a conservative estimate, in light of the significant testimony regarding the prevalence of crack sales by the defendant and his co-conspirators, including to Sal and members of the defendant's family – the defendant is responsible for selling 13,000 to 16,250 grams of crack.[16]  The Government is only seeking to hold the defendant accountable for 13,000 grams.

### C.    The Court Should Apply the Two Point Enhancements at § 2D1.1(b)(12) and 2D1.1(b)(16)(E) and Four Point Leadership Enhancement

The PSR concludes that the defendant maintained a leadership role within narcotics conspiracy, which consisted of at least five participants.  (PSR ¶¶ 13, 39, 48).  Therefore, a four point enhancement pursuant to U.S.S.G. § 3B1.1(a) is appropriate.  The defendant has not objected to these paragraphs, nor could he.  The evidence at trial was overwhelming that the defendant was an organizer or leader of the criminal activity and that the activity involved five or more participants.

Since the PSR concludes that the Guidelines pursuant to § 2A1.1 should apply, it does not reach the question whether the Court should apply two-point enhancements pursuant to U.S.S.G. § 2D1.1(b)(12) and § 2D1.1(b)(16)(E), which would only apply if the Court does not find the defendant murdered Sal.  Both enhancements should apply.  U.S.S.G. § 2D1.1(b)(12) applies

---

[16] For example, Simmons testified at trial that she smoked crack with the defendant's mother and co-conspirator, Linda Morris. This testimony was corroborated by a recorded call between the defendant and his mother while the defendant was in custody pending trial, in which Ms. Morris admitted to cutting up and smoking many grams of crack. (Tr. 154-156; GX FATICO-3).

where a defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance." This enhancement applies where the manufacturing or distributing of a controlled substance was "one of the defendant's primary or principal uses for the premises." U.S.S.G. §2D1.1, Application Note 17. Here, the evidence at trial established that the defendant had access to the vacant apartment on the fourth floor of 868 Faile Street, and that the apartment was regularly used to store and sell drugs.

The enhancement at § 2D1.1(b)(1)(E) applies where the defendant receives an aggravating role adjustment pursuant to § 3B1.1 and "committed the offense as part of the pattern of criminal conduct engaged in as a livelihood." The testimony at trial from Simmons, Saleh, Rivera, and Beharovic, establish that the defendant sold drugs to make a living. There is no evidence that the defendant had another job during this period of time, nor does he profess consistent work in the PSR. (*See* PSR ¶¶ 91-93).

### III.    The Court Should Impose a Guidelines Sentence of 324 Months

The Court should impose the Guidelines sentence of 324 months, or 27 years, and specifically a 240-month sentence on Count Four to be followed by the mandatory consecutive sentence of 84 months imprisonment on Count Three. The offense conduct could not be more serious. The defendant and his co-conspirators took over a residential building in the Hunts Point area inhabited by families, including children, and used it as a storefront for their narcotics conspiracy. They sold drugs not only out of multiple apartments in the building – including a vacant apartment to which they had no legal right – but also in the open spaces inside and outside of the building. The defendant possessed firearms to protect his drug business, and used and brandished the firearms to threaten the building's superintendent. And, of course, on August 11, 2016, the defendant used a firearm to shoot and kill Sal over a drug debt. This was a cold-blooded,

callous, and premeditated murder. And not only was this a heinous crime, but it was done at 1:30 p.m. in the afternoon on a day in August – when the building's residents, including children, were around to witness the murder and its immediate aftermath.

The defendant also has significant criminal history, including a prior conviction for attempted murder which occurred during an armed robbery. (PSR ¶ 58). During that incident, the defendant and a co-conspirator cornered a victim inside of the lobby of an apartment building and demanded money from the victim. The defendant then fired two shots at the victim. (PSR ¶ 58). The defendant was sentenced to 13 years in prison in connection with this conviction. While in prison, the defendant had numerous disciplinary infractions, including for violence and drug possession. (PSR ¶ 58). The defendant served jail time from approximately 2001 until his parole in approximately 2012. Within a few years of that release, the defendant was the leader of a narcotics conspiracy that he operated out of his family's apartment building, and murdered Sal.

Even absent the murder, the escalation of crime from armed robberies to organized armed drug trafficking would counsel in favor of a substantially more serious sentence than the prior 13-year prison term that clearly had no deterrent effect. Upon leaving prison the defendant immediately entered the narcotics conspiracy at issue in this case, in which he worked in a leadership role in a larger organization of his family members and sought greater control over the turf he would come to occupy. The defendant terrorized a building and neighborhood, turning it into his drug trafficking haven. Even more, he threatened others, including his innocent neighbors, in service of protecting drug turf and collecting drug debts, and engaged in premeditated murder. A lengthy term of imprisonment is necessary.

For these reasons, a sentence of 27 years is necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and protect the public from further

crimes of the defendant. It also bears noting that, while 27 years is undoubtedly a lengthy sentence, if not for the operation of the statutory maximum of 20 years with respect to Count Four, the defendant's Guidelines range would be higher – in fact, it would be life imprisonment. Therefore, imposing a sentence of 27 years does, in fact, give the defendant a lower sentence than the Guidelines might otherwise suggest is appropriate for this conduct and his criminal history.

## **CONCLUSION**

The evidence is overwhelming. On August 11, 2016, the defendant murdered Sal on the third-floor landing at 868 Faile Street. A witness saw the defendant commit the murder. Another witness saw the defendant arguing with – and threatening – Sal shortly before the murder and saw and heard the defendant brag about the killing after the murder. A third witness saw the defendant at the scene of the crime and had been previously threatened with firearms by the defendant. And a fourth witness saw the defendant and Sal in an argument about money shortly before the murder and was told by Sal that the defendant and his crew had assaulted him with a brick in the days before the killing. The call logs, video surveillance, and ballistics, forensic, and medical evidence all corroborate these accounts. And the defendant's post-arrest statements, both in 2016 and 2024, support a finding that he murdered Sal as they corroborate much of the witness testimony at trial. The defendant admitted that the victim sold drugs for him, and he admitted to speaking to the victim about drugs and money about an hour before the murder. He admitted to being present at 868 Faile Street on the third floor at the time of the murder and to being in the hallway near the victim's body shortly after the murder.

Accordingly, the Government has established by more than a preponderance of the evidence that the defendant murdered Sal and that the defendant was responsible for the drug weight identified in the PSR. As a result, the Court should find that the applicable Guidelines

range is 324 months' imprisonment on Count Three and Count Four, with a mandatory minimum sentence of 84 months' imprisonment.  The Court should impose the Guidelines sentence of 324 months' imprisonment.

Dated: New York, New York
        July 10, 2025

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney for
                                        the Southern District of New York

                                By:     _____/s/_____
                                        Camille L. Fletcher
                                        Matthew Weinberg
                                        Assistant United States Attorneys
                                        (212) 637-2383/2386

cc:    All Counsel

26