UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v.-                                                24 Cr. 154 (ER)

BRUCE MORRIS,

                    Defendant.

---

**SENTENCING MEMORANDUM**
**ON BEHALF OF BRUCE MORRIS**

Ezra Spilke
Mark S. DeMarco
Elizabeth Macedonio
Jeff Henle

*Counsel for Bruce Morris*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

DISCUSSION ................................................................................................................. 1

   I.   The Guidelines Calculation ................................................................................. 1

     A.   The government has failed to meet its burden that Morris killed Jemison under circumstances that would constitute murder under 18 U.S.C. § 1111............................ 2

     B.   The method that Probation uses to extrapolate drug quantity violates the Due Process Clause's guarantee that a defendant's sentence will be based on accurate information. ................................................................................................................. 9

     C.   The "criminal livelihood" and "maintaining a premises" enhancements do not apply. ........................................................................................................................... 13

   II.   Bruce Morris's Life History ............................................................................... 14

     A.   Early Life and Prior Incarceration ................................................................. 14

     B.   Release and Attempts to Turn His Life Around ........................................... 18

     C.   Substance Abuse and Mental Health ............................................................ 19

     D.   Incarceration at the MDC Brooklyn ............................................................. 20

     CONCLUSION ......................................................................................................... 22

Cases

*Apodaca v. Raemisch*, 139 S. Ct. 5 (2018) ................................................................. 15

*In re Medley*, 134 U.S. 160 (1890) ........................................................................... 15

*United States v. Blount*, 291 F.3d 201 (2d Cir. 2002) ................................................ 12

*United States v. Brooks*, No. 07-CR-00187 (CPS), 2008 WL 4693335, at *1 (E.D.N.Y. Oct. 23, 2008) ........................................................................................................................ 16

*United States v. Burks*, 784 F. App'x 821 (2d Cir. 2019) .......................................... 10

*United States v. Chavez*, Case No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024) ........................................................................................................................ 21

*United States v. Colucci*, Case No. 23-CR-417 (GRB), 2024 WL 3643857 (E.D.N.Y. Aug. 5, 2024) ........................................................................................................................ 21

*United States v. Easter*, 553 F.3d 519 (7th Cir. 2009) .............................................. 12

*United States v. Hickman*, 626 F.3d 756 (4th Cir. 2010) ........................................... 12

*United States v. Juwa*, 508 F.3d 694, 700 (2d Cir. 2007) .......................................... 10

*United States v. Rivera-Maldonado*, 194 F.3d 224 (1st Cir. 1999) ............................ 11

*United States v. Shonubi*, 103 F.3d 1085 (2d Cir. 1997) ........................................... 12

Other Authorities

Expert Report of Craig Haney, Ph.D., J.D. ("Haney Report") at 103-104, submitted on behalf of plaintiffs, inmates in solitary confinement in Pelican Bay, in *Ashker v. Brown*, No. 09-CV-5796 (N.D. Cal.), https://ccrjustice.org/sites/default/files/attach/2015/07/Redacted_Haney%20Expert%20Report.pdf ........................................................................................................................ 17

Expert Report of Terry A. Kupers, M.D., M.S.P. ("Haney Report") at 2, submitted on behalf of plaintiffs, inmates in solitary confinement in Pelican Bay, in *Ashker v. Brown*, No. 09-CV-5796 (N.D. Cal.), https://ccrjustice.org/sites/default/files/attach/2015/07/Redacted_Kupers%20Expert%20Report.pdf ........................................................................................................................ 18

Gary L. Wells, Margaret Bull Kovera, Amy Bradfield Douglass, Neil Brewer, Christian A. Meissner, John T. Wixted, *Policy and Procedure Recommendations for the Collection and Preservation of Eyewitness Identification Evidence*, 44 Law and Human Behavior 1, 3 (Feb. 2020) ........................................................................................................................ 6

Jane S. Cowden, *Charles Dickens in Pennsylvania in March 1842: Imagining America*, 81 Penn. Hist. 51-87 (2014) ........................................................................................................................ 15

Paige St. John, *California agrees to move thousands of inmates out of solitary confinement*, L.A. Times (Sep. 1, 2015), http://www.latimes.com/local/lanow/la-me-ln-california-will-move-thousands-of-inmates-out-of-solitary-20150901-story.html ........................................................................................................................ 17

President Barack Obama, Remarks at the NAACP Conference (July 14, 2015), https://www.whitehouse.gov/the-press-office/2015/07/14/remarks-president-naacp-conference ........................................................................................................................ 16

Robert King et al., *Sharing Experiences of Solitary Confinement—Prisoners and Staff* in Solitary Confinement: Effects, Practices, and Pathways Toward Reform 245 (Jules Lobel and Peter Scharff Smith eds., 2020)........................................................................................... 15

Sentencing Transcript, *United States v. Days*, Case No. 19-CR-619 (CM) (S.D.N.Y. Apr. 29, 2021) (ECF No. 35)................................................................................................ 20

U.S. Sent'g Guidelines Manual § 2D1.1 (U.S. Sent'g Comm'n 2024)............................... 3, 10, 13

U.S. Sent'g Guidelines Manual § 4B1.3 (U.S. Sent'g Comm'n 2024) ........................................ 14

U.S. Sent'g Guidelines Manual § 6A1.3 (U.S. Sent'g Comm'n 2024)........................................ 10

## INTRODUCTION

Bruce Morris's childhood and early life can only be described as tragic, traumatic and unstable. He grew up in foster care due to his mother's substance abuse. His father was absent. He experienced homelessness and poverty and an extended period of incarceration during late adolescence and early adulthood. He grappled with a severe substance use disorder that developed in his 30s and has a long history of unsuccessful treatment attempts. He also suffered the unexpected death of his wife.[1]

Bruce Morris, a 43-year old man who has endured a difficult life, now faces a substantial prison sentence. His difficult childhood and upbringing have contributed significantly to his current situation. Mr. Morris understands the significant effect his conduct had on the community and acknowledges that this Court must sentence him to a term of at least seven years imprisonment. We respectfully submit that these circumstances warrant a sentence below the advisory guideline range, an appropriate sentence which satisfies the objectives set forth in § 3553(a).

## DISCUSSION

### I.    The Guidelines Calculation

The defense makes the following objections to the Presentence Report. As noted below, further argument, where necessary, is provided after the objections.

¶¶ 2-5

The PSR does not note that the Court dismissed Counts One and Two and the discharge

---

[1] An exhaustive mitigation investigation was conducted on Mr. Morris's behalf. Much of the information contained herein is based on the interviews conducted and the records procured by the mitigation specialist, which are available to this Court upon request.

charge in Count Three of the S2 Indictment. (Dkt. 88).

¶¶ 23-35, 40

The defense objects to the inclusion of the narrative of the murder of Jerome Jemison. The trial on the murder-related charges resulted in a hung jury, mistrial and dismissal of those counts. Further reasons supporting this objection are provided below.

¶ 38

The defense objects to the quantity of narcotics reflected in the PSR. The quantity of crack cocaine is based on the testimony of Simmons, who testified under oath at trial and committed perjury. Any account of the quantity of drugs she purchased and from whom is unreliable. Moreover, the jury could not reach unanimity on the fact that the conspiracy as a whole involved even 28 grams of crack cocaine, let alone between 1,300 and 1,625 grams. *See* Dkt. 79 at p. 16. Likewise, the jury could not reach unanimity on the fact that the conspiracy involved more than 100 grams of heroin, let alone 8,060 grams. Further reasons supporting this objection are provided below.

¶ 39

The defense objects to the following sentence: "In 2016, MORRIS asked Customer-1's spouse to hold a firearm for him inside his apartment and promised to provide with crack cocaine as payment for storing the weapon." As set forth below, Simmons testified under oath and committed perjury. Accordingly, her account as to the firearm cannot be credited.

¶ 45

The defense objects to the application of § 2A1.1. Further reasons supporting this objection are provided below.

**A. The government has failed to meet its burden that Morris killed Jemison under circumstances that would constitute murder under 18 U.S.C. § 1111.**

The PSR applies § 2D1.1(d)(1) of the Guidelines, which states:

> If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply §2A1.1 (First Degree Murder) or §2A1.2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined under this guideline.

U.S. Sent'g Guidelines Manual § 2D1.1(d)(1) (U.S. Sent'g Comm'n 2024). Guideline 2A1.1 provides a base offense level of 43. (*See* PSR at ¶ 45). The defense objects.

The killing of Jerome Jemison was the focus of the trial held in January of this year. The jury could not reach unanimity as to the murder counts or even that Mr. Morris discharged a firearm. The Court scheduled a retrial of the open counts for several weeks after the partial verdict. In the interim, however, the government elected not to retry Mr. Morris and to dismiss the murder counts as well as the "discharge" portion of the firearm count. (Dkts. 84, 85, 87).

As it did at trial, the government now relies on the trial testimony of Mr. Morris's neighbor, Illia Simmons. (Gov't Br. at 6-7, 14). But the government's decision to dismiss the murder counts could only have stemmed from its assessment of the litigation risk it faced at a retrial of Mr. Morris. Simmons was the only eyewitness and her testimony formed, by far, the most significant portion of the government's proof on the murder counts. It is inconceivable that the government's assessment of her problematic performance at trial did not factor into its decision not to retry those counts.

First, Simmons's 911 call completely undermines her testimony at trial. (*See* GX 901). At trial, Simmons testified that she witnessed through her peephole Mr. Morris shooting Jemison.

(*E.g.*, Tr. at 120).[2] Before the gunshot, Simmons heard arguing outside her door, moved toward the door and looked through the peephole. (*Id.*) When she looked through the peephole, she could see only Mr. Morris standing in front of the door to Apartment 33. (Tr. at 124, 127; *see* GX 204, 273).

At some point, Simmons heard Jemison say: "I don't have money for the bundle." (Tr. at 120). From the sound of his voice, Simmons surmised that Jemison was between the stairs and her next-door neighbor's door. Mr. Morris responded by shooting Jemison. (Tr. at 121). She then backed away from her door and heard the door to Mr. Morris's apartment slam closed. (Tr. at 122).

Government Exhibit 901, which was admissible as an excited utterance, is totally inconsistent with Simmons's account. Simmons called 911 immediately after seeing Jemison laying on the landing. (See Tr. at 174 ("I reported that I seen Sal."); Tr. at 175 ("Q And you did that immediately, correct? A Yes.")). Simmons reported a man shot on the stairs. (GX 901). About one minute into the call, Simmons reported to the 911 operator that the police had arrived. (GX 901 at 1:17). Then, clearly addressing a person with whom Simmons had a close relationship, she said: "I thought somebody was shooting at the door, baby. . . . I thought somebody was shooting at the door. . . . Yes. I thought somebody was shooting at the door." (GX 901 at 1:25-1:42).

Simmons statements during the 911 call undercut her trial testimony in at least two ways. Simmons testified that she witnessed with her own eyes Mr. Morris, a man she claimed she bought crack cocaine from on a daily basis, discharging a gun at a person she came to learn was

---

[2] Unless otherwise labeled, citations to the transcript are to the trial transcript.

Jemison. But in the 911 call, Simmons said that she thought "somebody" was shooting at her door, not a person she knew well. Next, Simmons testified at trial that she saw the firearm being discharged, including where it was aimed. But in the 911 recording captured Simmons saying that she "*thought* somebody was *shooting at the door*," which implies that she did not see the gun ("thought") or where it was aimed ("shooting at the door"). It is impossible for the government to reconcile Simmons's statements during the 911 recording and her trial testimony, and it has never offered a plausible explanation for the contradiction.

Next, Simmons's testimony conflicts with the testimony of Wilfredo Rivera. Simmons testified that "about a minute or two" after the gunshot, Bobby and his friend Dre arrived at the apartment, at which point Simmons opened the door. (Tr. at 128). When she opened the door, she saw Jemison's body for the first time laying at the bottom of the stairs with Bobby holding him. (Tr. at 128, 173). Dre told Simmons to collect Bobby from the hallway "because he couldn't no longer do anything for him." (Tr. at 128).

But Rivera, who testified under oath at trial, did not see Bobby – or anyone else – near Jemison's fallen body. "Immediately" after hearing the gunshot, Rivera exited Apartment 23 and went to Jemison, who was laying on the landing. (Tr. at 350-51; *see* Tr. at 366-67). It took him mere seconds to reach Jemison. (Tr. at 367). At that time, Rivera "[i]mmediately" called 911. (Tr. at 351). Moments later, Mr. Morris came down the stairs from the third floor and, when Mr. Morris saw Jemison's body, shouted, "Sal got shot, Sal got shot." (Tr. at 352-53, 367). Mr. Morris stepped over Jemison and went down the stairs. (Tr. at 353). Rivera testified that nobody else came up or down the stairs until the police arrived. (Tr. at 354). And even though Rivera witnessed people come into the hallway, he saw only the occupants of Apartment 34. (Tr. at 368). Simmons's testimony that she saw Bobby holding Sal on the landing cannot be reconciled

with Rivera's testimony.

The government attempts to bolster Simmons's trial testimony with ballistics and autopsy evidence. The government claims that the absence of shell casings corroborates Simmons's testimony that Mr. Morris used a revolver. (Gov't Br. at 14). But there was no evidence – other than the fact that investigators never recovered a shell casing – that Jemison was shot with a revolver. And, in the eight and one-half years between Jemison's death and trial, Simmons could have learned that no shell casings were recovered in any number of ways. Simmons, who first reported to law enforcement that she was an eyewitness on April 11, 2022 (Tr. at 187), did not mention a revolver until her third or fourth interview on September 25, 2023. And, even then, she told prosecutors that she saw a handgun that she thought was gray or silver and "[m]aybe [a] revolver." (3524-002). Simmons's claim that she saw a revolver became more definite over time, which could easily have been the result of discerning, from subtle signals from her interviewers, that she was giving the "right answer."[3]

The autopsy evidence is even less corroborative. The government claims that the autopsy evidence explains the positioning of both Jemison and the shooter. (Gov't Br. at 14). But the autopsy evidence does no such thing. There was no evidence, aside from Simmons's testimony, establishing where the shooter or Jemison were standing at the time of the shooting. Besides,

_____

[3] This is not to suggest that any of the interviewers consciously tipped Simmons off or did anything unethical. But it would be unusual if proffer meetings were completely immune from the well-documented influence of administrator feedback on an interviewee in lineup settings. *Cf.* Gary L. Wells, Margaret Bull Kovera, Amy Bradfield Douglass, Neil Brewer, Christian A. Meissner, John T. Wixted, *Policy and Procedure Recommendations for the Collection and Preservation of Eyewitness Identification Evidence*, 44 Law and Human Behavior 1, 3 (Feb. 2020) (recommending the adoption of double-blind lineup procedures to eliminate the influence of even the unwitting influence of a lineup administrator).

Simmons, by her own admission, never saw Jemison through her peephole and, thus, had no idea, even by her own admission, whether he had his back to the shooter or was in the process of walking away.

The government also urges the Court to rely on portions of reports of law enforcement interviews with an ear witness Diana Gonzalez. (Gov't Br. at 18-19). Those notes reflect that Gonzalez told law enforcement that she heard a shot moments after an argument she overheard between Jemison and Mr. Morris. (3511-05 at 2, 3511-29 at 1, 3511-27 at 1, 3511-28).

Gonzalez testified at the hearing (but not at trial). Both in the notes and at the hearing, Gonzalez reported hearing an argument between someone Gonzalez believed to be Mr. Morris and another person over money and heard a loud bang. The critical difference between her testimony under oath, in open court and the interview notes was that, instead of moments after the argument ended, Gonzalez heard the loud bang 30 to 45 minutes later. (*See* Hearing Tr. at 32-33).

The government's attempts to refresh Gonzalez's recollection and impeach her with prior inconsistent statements did not succeed. When confronted with the interview reports, Gonzalez testified that they were inaccurate. (Tr. at 38, 41-43).

Despite not being able to impeach Gonzalez, the government gives no reason why the interview reports should be credited over Gonzalez's live testimony other than that they were made "closer in time to the events of August 11, 2016." (Gov't Br. at 19). But Gonzalez's hearing testimony was *consistent* with the statement she made *closest in time* to the shooting.

Gonzalez called 911 moments after the shooting. When the operator asked her whether the shooter was still present, Gonzalez responded: "I don't know. I don't know the person who shot him. We heard a loud pop in the hallway, and then, and we went to check what it was and,

and then there's somebody shot in the second floor." (GX 904 at 00:50-00:59). Thus, in the moments right after the shooting, Gonzalez reported that she did not know who the shooter was. Besides, the government cannot simultaneously urge the Court to credit earlier statements when they are helpful to its position, as in the case of Gonzalez's 911 call, and discredit them when they are unhelpful, as in the case of Simmons's early proffers in which she did not know the type of handgun used and her 911 call in which she thought somebody was shooting at the door.

The 911 calls of both percipient witnesses – Gonzalez and Simmons – should be credited. "[C]ircumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." Fed. R. Evid. 803 advisory committee's note on proposed rules.

Here, both Simmons and Gonzalez heard a loud bang on August 11, 2016. Moments, perhaps second later, before the excitement of the occasion dissipated, Simmons and Gonzalez reported what they witnessed as accurately as possible. They had no reason or opportunity to fabricate their reports. The Court should rely on the fact that neither Simmons nor Gonzalez connected Mr. Morris to the shooting in the critical minutes after the shooting.

The government's reliance on the trial testimony of David Saleh is also unavailing. Saleh testified that he overheard Mr. Morris and Jemison speaking about money in his deli before they both left. (Tr. 215-17). Ten to fifteen minutes later, according to Saleh, Mr. Morris returned to the deli, demanded a cigarette and stated: "I tell him, I'm going to blow his head off."

But critical aspects of Saleh's account were outlandish. First, Saleh's reason for calling 911 was facially implausible. He testified that, ten to fifteen minutes after Mr. Morris and Jemison left the deli, he heard a woman yelling that somebody was shot. (Tr. at 219). Even though the woman did not specify where the shooting took place, Saleh surmised that it was

inside a building. (Tr. at 229). Even more bizarrely, Saleh concluded that the building in which the shooting took place was on Gilbert. (*Id.*)

Setting aside the fact that the shooting took place on Faile Street, not Gilbert, and that Faile Street was two blocks away from the deli, there was no record of Saleh's purported 911 call even though the government produced all of the pertinent 911 calls in its possession. Likewise, there was no record that Saleh had called the precinct like he testified he did. And, despite having information that the government argues amounted to a confession to murder, there was no evidence that Saleh was interviewed by the detectives investigating Jemison's homicide. Next, despite Saleh's testimony that Mr. Morris frequently sold drugs in and around his deli and made lethal threats in his presence, Saleh could not identify Mr. Morris in Court. Finally, the government points to video surveillance which it argues corroborates Saleh's account. (Gov't Br. at 13). But the video surveillance showed Mr. Morris walking into 743 Hunts Point Avenue without a cigarette and with another man. Saleh testified that *Mr. Morris* returned to the deli, not Mr. Morris accompanied by another man.

In short, the government has failed to meet its burden that Mr. Morris killed Jemison under circumstances that would constitute murder under 18 U.S.C. § 1111. The government's only eyewitness likely committed perjury. The rest of the government's proof as to the murder counts (and even the discharge portion of the firearm count) is insufficient even under a preponderance standard. The cross-reference in § 2D1.1(d)(1) does not apply.

## B. The method that Probation uses to extrapolate drug quantity violates the Due Process Clause's guarantee that a defendant's sentence will be based on accurate information.

The PSR calculates that Mr. Morris is responsible for distributing 8,060 grams of heroin, between 2012 and 2023, and 1,300 grams of crack cocaine, between 2013 and 2023. (PSR at ¶ 38). The Sentencing Commission instructs:

> Where there is no drug seizure or the amount seized does not
> reflect the scale of the offense, the court shall approximate the
> quantity of the controlled substance. In making this determination,
> the court may consider, for example, the price generally obtained
> for the controlled substance, financial or other records, similar
> transactions in controlled substances by the defendant, and the size
> or capability of any laboratory involved.

U.S. Sent'g Guidelines Manual § 2D1.1 cmt. n.5 (U.S. Sent'g Comm'n 2024). According to the

Sentencing Commission, "[i]n resolving any dispute concerning a factor important to the

sentencing determination, the court may consider relevant information without regard to its

admissibility under the rules of evidence applicable at trial, provided that the information has

sufficient indicia of reliability to support its probable accuracy." U.S. Sent'g Guidelines Manual

§ 6A1.3(a) (U.S. Sent'g Comm'n 2024).

Criminal defendants have a "due process right to be sentenced based on accurate

information." *United States v. Juwa*, 508 F.3d 694, 700 (2d Cir. 2007). And "facts relevant to

sentencing must be found by a preponderance of the evidence." *Id.* at 701.

"To support a drug quantity approximation, courts must rely on evidence that 'points

specifically to a drug quantity for which the defendant is responsible.'" *United States v. Burks*,

784 F. App'x 821, 824 (2d Cir. 2019) (quoting *United States v. Shonubi*, 103 F.3d 1085, 1090

(2d Cir. 1997)). "While such evidence may be circumstantial or based on informed

approximation, it must be specific to the defendant and provide information regarding the

quantity of illicit goods." *Id.* (cleaned up; emphasis omitted) (quoting *United States v. Archer*,

671 F.3d 149, 162 (2d Cir. 2011)).

Probation inexplicably derives its estimate of the quantity of heroin multiplying the sales

to Beharovic, themselves based on an estimate, and multiplying them by 10.[4] This attempt at extrapolation is unreliable for a number of reasons.

First, Probation takes 2012 as the starting point of Mr. Morris's involvement. But Beharovic purchased heroin from Mr. Morris only once, in 2016 or 2017. (Tr. at 448; Hearing Tr. at 10-11). There is no other evidence that Mr. Morris joined a heroin conspiracy prior to that time period.

Next, although Beharovic testified that he purchased heroin in Hunts Point at least five days per week (Tr. at 439), he purchased from his good friend Jemison only 10 to 15 times total, (Hearing Tr. at 13). And Beharovic testified that he would buy heroin at other locations near 868 Faile Street. (Tr. at 439 ("Q When you were using heroin, where, if anywhere, else would you buy from besides 868 Faile Street? A Bryant and Seneca and also Hunts Point and Lafayette.")). Thus, not all of Beharovic's heroin purchases can be attributed to 868 Faille Street. Similarly, even in the case of purchases from 868 Faille Street, Beharovic did not testify that he always purchased from one of Mr. Morris's co-conspirators.

Finally, the inferential leap from the sales to one purchaser to a total quantity is susceptible to inaccuracy because of small sample size. "The core risk entailed in relying on such tiny samplings is that the smaller the sample size, the greater the likelihood that the evidence] reflects chance." *United States v. Rivera-Maldonado*, 194 F.3d 224, 231 (1st Cir. 1999) (cleaned up) (quoting *Stendebach v. CPC Int'l, Inc.*, 691 F.2d 735, 738 (5th Cir.1982) and collecting

---

[4] The PSR states that Beharovic purchased approximately 286 grams of heroin from Mr. Morris's co-conspirators, which constituted 10% of the conspiracy's heroin sales. Based on that calculation, 100% of the sales would be 2,860 grams, not 8,060 as the PSR states. (*See* PSR at ¶ 38).

cases). Accordingly, courts that have used extrapolation to support an estimate relied on much more and more reliable evidence than what the government offered here. For example, in *United States v. Blount*, 291 F.3d 201, 216 (2d Cir. 2002), a cooperator testified in detail about the operations of a drug business in which he played a critical role. *See also United States v. Easter*, 553 F.3d 519, 524 (7th Cir. 2009) ("[O]ne gang member testified to the operation of the conspiracy before 2005, evidence recovered from the trash showed that the gang operated several drug houses, several members of the gang were arrested between 2002 and 2005 on drug charges, and several buyers testified that they bought heroin from the gang in that time period."); *United States v. Shonubi*, 103 F.3d 1085, 1092 (2d Cir. 1997) (approving of using tests on four randomly selected heroin balloons to estimate quantity of heroin in 103 other balloons defendant possessed).

"To be sure, where courts have evidence of a number of transactions, they have been permitted to multiply that number by an average weight-per-transaction to reach an estimate, though the circuit courts have urged district courts to make conservative approximations." *United States v. Hickman*, 626 F.3d 756, 769 (4th Cir. 2010) (internal citation and quotation marks omitted) (collecting cases). Here, the sample size is exceedingly small – sales to a single purchaser – and thus the extrapolated quantity of heroin that Probation arrived at may be wildly inaccurate.

As to the quantity of crack cocaine, Probation's estimate relies entirely on Simmons's testimony. For the reasons discussed earlier, Simmons cannot be relied upon. But even if the Court credits Simmons's account as to her buyer-seller relationship with Mr. Morris, she only saw him with larger quantities of crack on only three occasions despite purchasing from him or one of his co-conspirators over the course of ten years. (Tr. at 138-39). On those occasions, Mr.

Morris possessed a "G-pack," or approximately $1,000 worth of crack cocaine. (Tr. at 139).

**C. The "criminal livelihood" and "maintaining a premises" enhancements do not apply.**

The government, for the first time, urges the Court to apply two enhancements under § 2D1.1. (Gov't Br. at 22-23). Unlike the defense, who, at the earliest opportunity, notified the government and the Court that it would oppose the imposition of the murder guideline and the government's estimate of the drug quantity (*see* Dkt. 84), the government has forfeited this argument.

Nonetheless, the government has not met its burden and the enhancements do not apply in any event. Section 2D1.1(b)(12) provides a two-level enhancement when a defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance." "Among the factors the court should consider in determining whether the defendant 'maintained' the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises." U.S. Sent'g Guidelines Manual § 2D1.1 cmt. n.17 (U.S. Sent'g Comm'n 2024). It is undisputed that Mr. Morris did not own or rent the vacant apartment. There is also insufficient evidence that, other than threatening Rivera to leave the vacant apartment on one occasion, Mr. Morris controlled access to, or activities at, the premises.

As to the other enhancement, §2D1.1(b)(16) provides a two-level enhancement if "the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood." U.S. Sent'g Guidelines Manual § 2D1.1(b)(16)(E) (U.S. Sent'g Comm'n 2024). In order to show that a pattern of criminal conduct was "engaged in as a livelihood," the government must establish both

> that (A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the

> then existing hourly minimum wage under federal law; *and* (B) the
> totality of circumstances shows that such criminal conduct was the
> defendant's primary occupation in that twelve-month period (e.g.,
> the defendant engaged in criminal conduct rather than regular,
> legitimate employment; or the defendant's legitimate employment
> was merely a front for the defendant's criminal conduct).

U.S. Sent'g Guidelines Manual § 4B1.3 cmt. n.2 (U.S. Sent'g Comm'n 2024); *see* U.S. Sent'g

Guidelines Manual § 2D1.1 cmt. n.20(C) (U.S. Sent'g Comm'n 2024) ("For purposes of

subsection (b)(16)(E), 'pattern of criminal conduct' and 'engaged in as a livelihood' have the

meaning given such terms in §4B1.3 (Criminal Livelihood)."). Assuming that the government

could establish that selling drugs was Mr. Morris's primary occupation over a twelve-month

period, it cites no evidence whatsoever that he derived an income that exceed 2,000 times the

hourly minimum wage under federal law.

## II.    Bruce Morris's Life History

### A.  Early Life and Prior Incarceration

Bruce Morris grew up in The Bronx and Manhattan, spending the first five years of his

life with his grandmother, Janet Baldwin (80) in the Riverdale Projects in Harlem. His mother

was battling a crack-cocaine addiction and his father, who abused heroin, had another family that

he cared and provided for. Mr. Morris recalls how his mother, who suffered from a corrosive

crack addiction and was rarely home, was wholly incapable of caring for him or his siblings.

At the age of only five-years-old, because of his defiance and disobedience, Bruce was

placed in the foster care system where he spent the majority of his childhood. At the age of 19,

he was convicted of attempted murder and was incarcerated for roughly 13 years, five of which

was spent in solitary confinement.

The dangers of solitary confinement are well-researched and well-known. The

Pennsylvania System – a precursor to modern-day, American solitary confinement – was a

Quaker-inspired, penal philosophy that posited that silent isolation would encourage prisoners to ponder their crimes in enforced penitence. Robert King et al., *Sharing Experiences of Solitary Confinement—Prisoners and Staff* in Solitary Confinement: Effects, Practices, and Pathways Toward Reform 245 (Jules Lobel and Peter Scharff Smith eds., 2020). In the silence, the thinking went, the prisoners would find rehabilitation. Instead, they found madness and despair.

As far back as the 1840s the folly of the Pennsylvania System's hypothesis was obvious. In 1842, when Charles Dickens visited the Eastern State and Western State Penitentiaries in Pennsylvania, he interviewed a number of prisoners subject to the Pennsylvania System. One "look[ed] as wan and unearthly as if he had been summoned from the grave." Jane S. Cowden, *Charles Dickens in Pennsylvania in March 1842: Imagining America*, 81 Penn. Hist. 51-87 (2014). Another man "humbly begs and prays for work." Id. at 78. The man may have been an inspiration for Alexandre Manette in *A Tale of Two Cities* who was locked in solitary in the Bastille for eighteen years and, even when finally freed, would compulsively make shoes whenever something reminded him of his ordeal. *See Apodaca v. Raemisch*, 139 S. Ct. 5, 9 (2018) (Sotomayor, J., dissenting from denial of certiorari).

In 1890, the Supreme Court made the connection between solitary confinement and cognitive and emotional decline and even suicide. *In re Medley*, 134 U.S. 160, 168 (1890) ("[A] considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."). More recently, President Obama bemoaned the futility of solitary confinement:

-15-

The social science shows that an environment like that is often more likely to make inmates more alienated, more hostile, potentially more violent. Do we really think it makes sense to lock so many people alone in tiny cells for 23 hours a day, sometimes for months or even years at a time? That is not going to make us safer.  That's not going to make us stronger. And if those individuals are ultimately released, how are they ever going to adapt?[5]

A frank, first-person account of solitary confinement came from former New York City Correction and Police Commissioner Bernard Kerik. When he was imprisoned on federal fraud and false-statement charges, Mr. Kerik was told by prison officials that they were placing him in solitary confinement for his own protection. He remained in isolation for ninety days. Describing solitary confinement as cruel and unusual punishment, Kerik said:

> It is mind-altering. . . . You hallucinate; you talk to yourself. No one understands what it's like until you've been there, and we, in this country, use it way too much. . . . You create monsters in prison, and sometimes we forget they've got to go back to society. Most people that are in prison are returning back to society. Do we want them returning back to society warped?[6]

Dickens observed that the men he met in 1842 seemed buried alive or entombed in stone. Similarly, the current social science that President Obama referred to speaks of "social death" or, as one inmate put it, "no-touch torture," *United States v. Brooks*, No. 07-CR-00187 (CPS), 2008 WL 4693335, at *1 (E.D.N.Y. Oct. 23, 2008). Dr. Craig Haney evaluated individual prisoners housed in the Pelican Bay SHU *and* did a meta-analysis of the studies conducted on populations

---

[5] President Barack Obama, Remarks at the NAACP Conference (July 14, 2015), https://www.whitehouse.gov/the-press-office/2015/07/14/remarks-president-naacp-conference.

[6] America's Forum (Newsmax TV broadcast Apr. 1, 2015), http://www.newsmax.com/Newsmax-Tv/bernard-kerik-solitary-cruel-unusual/2015/04/01/id/635837/#ixzz3kcU7oy5D.

of prisoners kept in prolonged solitary confinement.[7] He concluded that such confinement

transformed the people who have endured it, not merely affected them, and found that long-term

isolation produces changes that were "qualitatively different" from changes caused by short-term

isolation:

> It has forced these prisoners to truly become—not just to more
> briefly endure being—asocial and alone. Prisoners in [Pelican
> Bay's SHU] have been subjected to a form of "social death" that
> has undermined and even destroyed their relationships with others,
> and damaged their ability to function as social beings.
>
> The passage of time has not ameliorated or desensitized them to
> the pain they are experiencing but, if anything, has deepened the
> sense of loss and the realization that [they] can never fully recover
> much of what has been taken from them. In a very real and
> fundamental way, they have undergone a transformation in their
> personalities as a result of the conditions of isolated confinement
> and social exclusion to which they have been subjected. At a basic
> level, they are no longer people who can comfortably and normally
> interact with, relate to, or care about other human beings.[8]

---

[7] In a class-action lawsuit against California State officials on behalf of inmates at Pelican Bay
State Prison who had spent more than ten years in solitary confinement, the inmates filed reports
from by experts in the effect of isolation on mental health. *Ashker v. Brown*, No. 09-CV-5796
(N.D. Cal.). Dr. Craig Haney and Dr. Terry Kupers were two of the many experts who field
reports to the court. The lawsuit resulted in a settlement whereby the State of California agreed
to transfer nearly 2,000 inmates out of solitary confinement and into the general population and
end the practice of keeping inmates in isolation based on gang membership. Paige St. John,
*California agrees to move thousands of inmates out of solitary confinement*, L.A. Times (Sep. 1,
2015), http://www.latimes.com/local/lanow/la-me-ln-california-will-move-thousands-of-inmates-
out-of-solitary-20150901-story.html.

[8] Expert Report of Craig Haney, Ph.D., J.D. ("Haney Report") at 103-104, submitted on behalf of
plaintiffs, inmates in solitary confinement in Pelican Bay, in *Ashker v. Brown*, No. 09-CV-5796
(N.D. Cal.),
https://ccrjustice.org/sites/default/files/attach/2015/07/Redacted_Haney%20Expert%20Report.pd
f; *see also id.* at 9; *cf.* Ex. B at 10 ("While post-traumatic stress is unlikely in and of itself to
cause the severe decline in cognitive functioning that Kareem exhibits, it can have significant
impact upon memory and new learning especially with continued high levels of anxiety.").

Although the prisoners Dr. Haney studied at Pelican Bay had endured solitary confinement for ten years, "the American Psychiatric Association defined 'prolonged segregation' as segregation lasting for four weeks or longer (which the APA also said 'should be avoided' for the seriously mentally ill)." *Id.* at 11.

Dr. Terry Kupers, a psychiatrist with an expertise in studying prisoners interviewed twenty-four prisoners or ex-prisoners who spent ten or more years at the Pelican Bay SHU.[9] According to Dr. Kupers, the effects of solitary confinement persisted long after the inmates were released from solitary confinement. Through Dr. Kupers's interviews, he identified a syndrome found in 100 percent of the prisoners he interviewed what he termed SHU Post-Release Syndrome. *E.g., id.* at 42. Dr. Kupers found that, even after being released, the prisoners reported the same symptoms that would have afflicted them in the SHU: "intense anxiety, disordered thinking and paranoia, problems concentrating, problems with memory, compulsive acts, despair, suicidal thoughts or actions, severe insomnia, nightmares, . . . [a] tendency . . . to numb their feelings and isolate themselves even more than SHU confinement required, and . . . mounting despair." *Id.*

**B. Release and Attempts to Turn His Life Around**

Mr. Morris spent five of his most formative years in solitary confinement. There is no doubt that it left its scars. However, while incarcerated at Butler Correction Center, Mr. Morris was given a new reason to live. He met his wife, Faith, in 2000 and they married in 2005.

---

[9] Expert Report of Terry A. Kupers, M.D., M.S.P. ("Haney Report") at 2, submitted on behalf of plaintiffs, inmates in solitary confinement in Pelican Bay, in *Ashker v. Brown*, No. 09-CV-5796 (N.D. Cal.), https://ccrjustice.org/sites/default/files/attach/2015/07/Redacted_Kupers%20Expert%20Report.pdf.

Upon his release from custody in 2012, Mr. Morris attempted to turn his life around. He hosted several radio shows and sought to become an entrepreneur through investing. He was involved in the music industry and in 2014, he toured for one week with Ricky Batts, a "freestyle rapper." He toured again in 2023 from March through June, again with Ricky Batts.

In addition to hosting the above referenced radio show and briefly touring with a rap artist, Mr. Morris has a history of menial employment, including working in a bakery for about a year and unloading trucks. As a participant of Ready, Willing, and Able, Mr. Morris was employed as a maintenance technician from September 2022 through April 2023, leaving only due to a relapse. He has also worked as a home health aide and at a fast food restaurant.

Although Faith struggled with depression and alcohol abuse, she and Mr. Morris maintained a good relationship until her death from COVID-19 in April 2020. Her death caused Bruce to increase his drug use to cope.

### C. Substance Abuse and Mental Health

Mr. Morris has a long-documented history of substance use, beginning with marijuana use at the age of 15 and PCP use at the age of 16. When Mr. Morris was 34 years of age, he began consuming alcohol, and using cocaine, Oxycodone, and Percocet. At their peak, he was inhaling 3-4 grams of cocaine daily, inhaling 5 bags of PCP daily, consuming 1 pint of alcohol daily, smoking 5 blunts daily, and ingesting 10 opiate pills daily. He also used ecstasy and "Molly."

Bruce has acknowledged that his substance use has created a path of destruction, and he has suffered many negative consequences as a result of his use. According to previous Michigan Alcoholism Screening Test (MAST) and Drug Abuse Screening Test (DAST) assessments completed while at "RROCC", an acronym Mr. Morris was unable to detail, Mr. Morris admitted to trying to control and feeling bad about his use; using multiple substances; experienced others

complaining about his use; has lost friends; has had family tried to intervene; has sought

previous help; has created problems with spouse, has neglected family and work; has lost a job

because of his use; has gotten into fights, and; has been arrested while using.

He has experienced withdrawal, has engaged in illegal activities to obtain drugs, has

experienced blackouts, has attended AA meetings, has felt guilty about continuous use, and has

experienced tremors and hallucinations from alcohol.

According to substance use treatment records obtained, Mr. Morris has a history of

paranoid schizophrenia diagnosis, which he received in 2010 while incarcerated in Orange

County, New York. He recalls being prescribed medication and attending a 28-day program after

he was diagnosed but stopped all medications shortly thereafter. He has not taken medication for

his diagnosis since 2021. There is an additional diagnosis history of bipolar disorder, depression,

and anxiety.

Although there is a history of prescription medication, Mr. Morris reported he has not

taken and psychotropic medications since 2021. There is also a history of self-harm: in February

and March of 2020, Mr. Morris, while under the influence of various substances, was found

walking into traffic. He was taken to the hospital on both occasions and admitted to having

suicidal ideations, stating he was hoping that a car would hit him. While in the hospital, he

admitted to hallucinating while using substances and described seeing a "shadow moving," but

expressed he "tries to block it out."

### D.  Incarceration at the MDC Brooklyn

Since June 7, 2024, Bruce has been incarcerated at the Metropolitan Detention Center

(MDC) in Brooklyn, the conditions of which are well known to the Court. Judge Colleen

McMahon described the MDC as "disgusting" and "inhuman," *see* Sentencing Transcript at 19-

21, *United States v. Days*, Case No. 19-CR-619 (CM) (S.D.N.Y. Apr. 29, 2021) (ECF No. 35),

and Judge Cheryl L. Pollak described it as a "third world country" prison.[10]

Recently, this Court had the following to say about the conditions at the MDC:

> In the winter of 2019, a power outage left inmates without light or heat for a full week while a polar vortex swept the East Coast. Since that time, the dockets of this Court and the Eastern District have been filled with cases in which defendants complain about near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care. Contraband – from drugs to cell phones – is widespread. At least four inmates have died by suicide in the last three years. It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable.

*United States v. Chavez*, Case No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024) (internal footnotes omitted).

The Court ultimately held that "the conditions at the MDC constitute 'exceptional reasons' why detention of most defendants who do not pose a risk of flight or danger to the community … 'would not be appropriate'" Id. at *8 (citation omitted).

Similarly, in the sentencing context, as Judge Brown noted in *United States v. Colucci*, Case No. 23-CR-417 (GRB), 2024 WL 3643857 (E.D.N.Y. Aug. 5, 2024), the determination of sentence "is further complicated by an extrinsic factor that looms large in nearly every bail and sentencing determination made in this judicial district: the dangerous, barbaric conditions that have existed for some time at the" MDC, where:

> Chaos reigns, along with uncontrolled violence. Griffin, 2024 WL 2891686 at *3 (describing rampant "violence and the threat of violence" at MDC). Through review of sealed documents, official

---

[10] https://www.nydailynews.com/2016/10/07/exclusive-judge-refuses-to-send-women-to-brooklyn-jail-with-third-world-conditions/.

> government statements, judicial opinions and news media reports,
> this Court has identified shocking instances of brutal violence
> within the facility. This review is necessarily limited, as the Court's
> access to relevant information was exceptionally narrow. In other
> words, there were, most certainly, other incidents not collected
> during this Court's review. Nevertheless, the results are staggering.
>
> Each of the five months preceding this opinion was marred by
> instances of catastrophic violence at MDC, including two apparent
> homicides, two gruesome stabbings and an assault so severe that it
> resulted in a fractured eye socket for the victim. One knife attack
> was captured on a surveillance video producing images that are
> horrifying beyond words. The activities precipitating these attacks
> are nearly as unthinkable and terrifying as the ensuing injuries:
> drug debt collection, fights over illegal narcotics, resisting an
> organized gang robbery, internecine gang disputes and as yet-
> unidentified "brawls."

*Colucci*, 2024 WL 3643857.

Despite the MDC's challenging environment, Mr. Morris has been a gentleman and a model inmate. He has maintained a low-profile at the MDC and has incurred no disciplinary infractions. On November 12, 2024, Morris completed an educational course entitled "National Parent Program." (PSR at ¶ 8).

## CONCLUSION

Like so many young men who come before this Court, Bruce Morris comes from a deprived background. They lack appropriate male role models in their homes and they grew up in an environment of personal abuse, illegal drugs, general poverty and instability. Indeed, a punitive approach alone will not address the underlying issues contributing to Bruce's criminal behavior. It will be essential for Mr. Morris to have access to programming that provides him with the necessary support to address all of these issues. Participation in these programs can enhance his self-esteem, provide a sense of purpose, and reduce the likelihood of recidivism upon release.

In addition, by incorporating substance use treatment, trauma-informed mental health

services, vocational and educational programming, Mr. Morris will be better equipped to address his underlying issues, acquire skills for successful reintegration, and decrease his likelihood of re-offending. A focus on rehabilitation during his any term of incarceration offers the best opportunity for him to transform his life, successfully re-enter society, and become a productive member of his community.

Accordingly, for the reasons set forth above, the defense respectfully requests that this Court impose a sentence which is "sufficient, but not greater than necessary" to comply with the goals set forth in 18 U.S.C. § 3553(a)(2). The defense also respectfully requests that this Court recommend, pursuant to 18 U.S.C. § 3582(a), that the United States Bureau of Prisons designate Mr. Morris to be housed in a facility in the Northeast Region of the United States to facilitate family visits.

Accordingly, we urge Your Honor to give effect to the statutory admonition embodied in § 3553(a) by imposing a sentence significantly less than that suggested by the United States Sentencing Guidelines and impose the mandatory minimum sentence of seven years' imprisonment.

Dated:        Brooklyn, New York
              July 23, 2025

                                    Respectfully submitted,


                                    _____/s/ Ezra Spilke_____
                                    Ezra Spilke
                                    Mark S. DeMarco
                                    Elizabeth Macedonio
                                    Jeff Henle
                                    *Counsel for Bruce Morris*
                                    1825 Foster Avenue, Suite 1K
                                    Brooklyn, NY 11230
                                    Tel: (718) 783-3682