UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

BRUCE MORRIS,
    a/k/a "G,"

              Defendant.

24 Cr. 358 (JMF)

---

**GOVERNMENT'S POST-HEARING REPLY**

JAY CLAYTON
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Camille L. Fletcher
Matthew Weinberg
Assistant United States Attorneys
    *Of Counsel*

## PRELIMINARY STATEMENT

The Government respectfully submits this reply to the defendant's post-hearing brief. (Dkt. No. 102). As the Government set forth in its opening brief (Dkt. No. 101), the evidence introduced at the trial and *Fatico* hearing in this case established by at least a preponderance of the evidence that, on August 11, 2019, Bruce Morris, a/k/a "G" (the "defendant"), murdered Jerome Jemison, who everyone called Sal. The Government also established by a preponderance of the evidence that, as a conservative estimate, the defendant is responsible for distributing at least 8,060 grams of heroin and at least 1,300 grams of cocaine base in connection with the narcotics conspiracy that is the subject of Count Four of the Indictment. Finally, if necessary to reach this question, the Court should apply the enhancement for "maintaining a premises" for the purpose of manufacturing or distributing a controlled substance, pursuant to U.S.S.G. § 2D1.1(b)(12) and for engaging in a "criminal livelihood," pursuant to U.S.S.G. § 2D1.1(b)(16)(E).

The appropriately calculated Guidelines sentence is therefore 240 months' imprisonment on Count Four, with a mandatory consecutive sentence of 84 months' imprisonment on Count Three, for a total Guidelines sentence of 324 months. In light of the nature and circumstances of the offense and the history and characteristics of the defendant, the Court should impose the Guidelines sentence.

## ARGUMENT

### I.      The Government Has Met its Burden With Respect to the Murder

The Government's opening brief details the overwhelming evidence that the defendant murdered Sal inside 868 Faile Street on or about August 11, 2016. The Government's evidence includes the testimony of five independent civilian witnesses, including (1) an eyewitness (Simmons) who saw the defendant commit the murder, (2) an earwitness (Gonzalez) who heard

the defendant in an argument with Sal prior to the murder, (3) a witness (Saleh) who saw the defendant and Sal in a dispute immediately before the murder and heard the defendant essentially acknowledge the murder right after it, (4) a witness (Rivera) who saw the defendant at the scene of the murder and had previously been threatened with a firearm by the defendant, and (5) a witness (Beharovic) who saw the defendant and Sal in an argument about money inside of 868 Faile Street in the weeks leading up to the murder, and heard from Sal in the days leading up to the murder that a laceration on Sal's forehead was the result of an incident in which Sal was hit with a brick by the defendant and the defendant's crew. These witness accounts were corroborated by forensic and medical evidence, call logs, video surveillance, and the testimony of law enforcement witnesses.

The defense attempts to overcome this evidence by claiming that Simmons and Saleh are lying. To support these accusations of perjury, the defense takes issue with relatively minor and inconsequential details of their testimony. But none of defense's arguments provide a basis to discount the damning testimony of the Government's witnesses, who also corroborate each other and are corroborated by the other evidence adduced at trial and at the hearing. At most, the defense has identified certain areas in which the testimony or evidence is ambiguous, or has noted relatively minor inconsistencies which can be explained by the passage of time and the imprecise nature of witness statements.

a. The Simmons 911 Call Does Not Undermine Her Trial Testimony

As defense argued during summation at trial, the defense brief attempts to undercut Simmons's testimony that she saw the defendant commit the murder by reference to her contemporaneous 911 call, which she made immediately after witnessing the murder on August 11, 2016. Defense argues that, because Simmons is heard saying on that call, "I thought somebody

2

was shooting at the door, baby," this suggests that (1) she did not actually see the defendant shoot Sal, since she referred only to "somebody," and not a person she claimed to know well, such as the defendant, and (2) she did not actually see the gun or where it was aimed at all, since she says she "thought" somebody was shooting "at the door." (Def. Br. at 4). The defense further argues, without explanation, but presumably because of the use of the word "baby," that Simmons was speaking to "a person with whom Simmons had a close relationship." (*Id.*). The defense concludes that it is "impossible" for the Government to reconcile Simmons's statements to the 911 operator with her trial testimony. (*Id.* at 5).

The defense is wrong. As an initial matter, as the Government noted in its rebuttal summation at trial, it is telling that the defense did not cross-examine Simmons on these supposed inconsistencies during her trial testimony. Nor did defense seek to call Simmons as a witness at the *Fatico* hearing, knowing that they intended to make this argument. The inescapable conclusion is that defense would rather claim that there are irreconcilable inconsistencies between the 911 call and the trial testimony rather than continue to build the record with credible testimony about the defendant's drug trafficking and murder. Since the defense did not cross-examine Simmons on this subject, the Court should not simply credit the defense's interpretation of Simmons's statements on the 911 call.[1]

For example, despite defense's assertion that Simmons was speaking to someone with whom she "clearly had a close relationship," there is no evidence indicating who Simmons was

---

[1] The Government is not suggesting that the defense had any burden, at trial or at the *Fatico* hearing, to prove that Simmons was lying. But in light of the overwhelming evidence of the defendant's guilt, the Court should not simply credit defense's speculative and unsupported suggestion that not only is the 911 call inconsistent with Simmons's trial testimony, but also that the inconsistency is sufficient to overcome the remainder of Simmons's testimony and other evidence of the defendant's guilt.

speaking to when she said that she "thought somebody was shooting at the door, baby."  Simmons could have been speaking to her then five-year-old daughter, who Simmons may not have wanted to tell that she had just seen their neighbor shoot someone.  Or she could have been speaking to herself, or the 911 operator, or to no one in particular.  At trial, defense argued that Simmons was addressing her husband, Bobby Dixon.  (Tr. 729).  As the Government noted in its rebuttal summation, it is plausible that Simmons was addressing Dixon, but she also could have been addressing any number of other individuals.

In any event, there are numerous plausible explanations for why Simmons saw the defendant murder Sal, but still said on the 911 call that she thought "somebody was shooting at the door."  For example, even if Simmons were speaking to someone with whom she had a "close relationship" *and* to whom she could otherwise speak freely about what she had seen, she may not have felt comfortable speaking openly in light of the ongoing commotion happening in the hallway outside her door, where several members of the defendant's family were present.  And Simmons' reference that she thought "somebody" was "shooting at the door" could be a natural response to observing someone raise a firearm immediately outside of her apartment door.  Or the reference to somebody shooting "at the door" could have simply been an imprecise reference (made in a panic) to the location of the shooter, as opposed to the direction in which the firearm was aimed – i.e., that someone was standing at or *near* the door while shooting.

If anything, the clear terror in Simmons's voice during the 911 call suggests that Simmons not only heard the gunshot and saw Sal's body, but she saw the defendant murder Sal.  In her panic after seeing someone (indeed, a neighbor who she knew well) fire a shot right outside her door while her five-year-old daughter was home, Simmons used imprecise language in describing the location of the shooter.

There are numerous plausible explanations for why Simmons made that comment during the 911 call. To the extent there is any ambiguity about Simmons's statement on the 911 call, the defense could have sought to address that ambiguity during cross examination and/or at the *Fatico* hearing, which they did not.

        b.  <u>The Rivera Testimony Does Not Materially Conflict with Simmons's Testimony</u>

Next, defense argues that Simmons's testimony conflicts with the testimony of the building's super, Mr. Rivera. Specifically, Simmons testified that, "about a minute or two" after the gunshot, her husband Bobby Dixon and his friend, Dre, arrived at the apartment. (Tr. 128; 6-10). Simmons stated that, when she opened the door for Dixon and Dre, she saw Sal lying at the bottom of the stairs, with Dixon holding him. (Tr. 128; 11-17). Simmons testified that Dre told her to get Dixon to come back into the apartment, because Dixon could not do anything for Sal. (Tr. 128; 21-22).

Rivera, meanwhile, testified that he proceeded to Sal's body immediately after hearing the gunshots, and arrived there within seconds of the shooting. (Tr. 367; 20-25). Rivera testified that he immediately called 911, and that, moments later, he saw the defendant come down the stairs from the third floor, repeating, "Sal got shot, Sal got shot." (Tr. 352; 21-25). Rivera did not recall anyone else coming up or down the stairs before the police arrived, nor did he specifically recall seeing Dixon or Dre, though he did testify that after the defendant came down the stairs, a "good amount of people came out of" the defendant's family's apartment on the third floor of the building, located across from Simmons's apartment. (Tr. 353-354).

These statements are not materially irreconcilable. As an initial matter, it is not even clear the statements are inconsistent at all, as it is possible that Rivera did see Dixon and/or Dre, but that he confused or otherwise grouped them with the "good amount of people" that came out of the

defendant's family's apartment after the shooting.  In any event, while there is some uncertainty as to the precise timing of Dixon's and Dre's return to the apartment vis-à-vis the shooting, the arrival of the police, and the arrival of Rivera at Sal's body, this uncertainty is inconsequential. And to the extent that Rivera and/or Simmons have the timing slightly off, this can be easily explained by the passage of time and the imprecise and varied way in which individuals, including witnesses, describe intervals of time – i.e., "minutes" versus "seconds" versus "moments."

Perhaps most importantly, defense cannot articulate why Simmons (or Rivera) would be lying about their recollection of who arrived at what time and cannot explain why these discrepancies should cast doubt on Simmons's testimony more generally.  To the extent Simmons's and Rivera's testimony are inconsistent, they are not inconsistent in a way that matters to the ultimate question whether Simmons saw the defendant murder Sal.

      c.   <u>The Ballistics and Autopsy Testimony Corroborate Simmons</u>

Defense next argues that the Government's efforts to "bolster" Simmons's testimony with ballistics and autopsy evidence are misguided.  (Def. Br. at 6).  With respect to the ballistics evidence, the defense notes that the Government did not conclusively establish that the murder weapon was a revolver and argues that Simmons may have picked up on unconscious signaling from interviewers that she was giving the "right" answer when she said that she believed she saw a revolver.[2]  With respect to the autopsy evidence, defense argues, in conclusory fashion, that the

---

[2] The defense argues that the Court should not credit Simmons' trial testimony about the murder weapon being a revolver because Simmons did not mention a revolver to law enforcement until the third or fourth interview.  (Def. Br. at 6).  First, the defense is aware of this timing because of the Government's diligent notetaking but again chose not to inquire about it on cross.  Moreover, it is hardly surprising that this detail did not come out in the first discussions that Simmons had with law enforcement about the murder, since those discussions were more focused on the weightier issues regarding what Simmons saw and her relationship with the defendant and Sal.  If anything, the fact that Simmons did not mention the revolver until the third or fourth interview reinforces the Government's argument that, to Simmons, this is a passing and relatively

autopsy evidence, even when combined with the ballistics evidence, does not establish the specific positioning of Sal and the shooter, and that there was no evidence – aside from Simmons's testimony – establishing where the shooter and Sal were at the time of the murder. The defense further notes that Simmons testified that she did not even see Sal, and therefore she did not know where Sal was positioned. (*Id.* at 7). The defense is misconstruing the Government's arguments with respect to this evidence. The Government does not contend that it had conclusively proven that a revolver was used to kill Sal. Nor does the Government contend that the autopsy report necessarily proves where Sal and the shooter were specifically positioned. But the ballistics and forensic evidence are *consistent* with the Government's theory of the case and provide *independent corroboration* of Simmons's testimony. This evidence is particularly powerful given that Simmons – who defense argues is a perjurer – would have had no basis for knowing that the Government's evidence was consistent with her claims about the revolver and where the defendant was standing, and would have had no reason to stick her neck out and make these assertions unless she had actually seen the crime.

With respect to the revolver, the defense also argues that Simmons could have learned that no shell casings were recovered in any number of ways in the period of time between the shooting and her testimony. (Def. Br. at 6). This is entirely speculative and makes little sense. There was no evidence that Simmons was chatting with the responding ECT officers or examining the scene; to the contrary, the evidence is that Simmons was terrified. In any event, Simmons has never expressed any understanding that revolvers do not leave shell casings and/or that no shell casings were recovered at the scene – she testified that she believed the firearm was a revolver because of

---

inconsequential detail, because she does not appreciate the significance of the testimony – and therefore had no reason to make it up.

the "cylinder." (Tr. 122; 2-10). To this day, the Government does not know if Simmons even understands the significance of her testimony that she believed she saw a revolver. And, yet again, the defense did not ask her.

Similarly, with respect to the forensic evidence, it does not matter that Simmons testified that she did not know where Sal was standing at the time of the shooting. The point is that Simmons saw the *defendant* fire the shot, and she knows where the *defendant* was standing. If Simmons had only heard the shooting, but did not see it, then the shooter could have been located anywhere from which he had a direct shot at Sal. If Simmons did not witness the murder, it would be a remarkable coincidence that the autopsy suggests that Sal was shot directly in the back of the head – exactly consistent with Simmons' testimony of where she saw the defendant when he shot Sal.

d. Gonzalez's Out of Court Statements to Law Enforcement Should be Credited; In Any Event, Her Testimony at the Hearing is Highly Inculpatory

As explained in the Government's opening brief, the Court should credit Diana Gonzalez's damning out of court statements to law enforcement about the timing of the gunshot and the loud argument that she heard from the floor below her on the day of the shooting. (3511-05 at 2, 3511-29 at 1, 3511-27 at 1, and 3511-28). The out-of-court statements were consistent with each other, made closer in time to the murder, and made outside of open court and the presence of the defendant – where Gonzalez had desperately sought to avoid testifying, including by risking arrest and making a motion to quash her arrest warrant and subpoena. Gonzalez's out-of-court statements, of course, are also consistent with Simmons' entirely independent eyewitness account of the murder.

The defense argues that the Court should credit Gonzalez's in-court testimony over the out-of-court testimony because, the defense claims, the in-court testimony is consistent with

8

Gonzalez's contemporaneous 911 call, placed shortly after the murder. (Def. Br. at 7-8). As an initial matter, the Government notes that Gonzalez's 911 call is not in evidence. But even if the Court were to consider that call, the fact that Gonzalez "reported that she did not know who the shooter was" during her 911 call, (Def. Br. at 8), is *not* inconsistent with Gonzalez's out-of-court statements to law enforcement. Gonzalez has never claimed to know who committed the murder, and the Government did not seek to elicit that information from her during her testimony. Rather, Gonzalez simply told law enforcement that she heard the defendant arguing with someone in the moments before she heard the gunshot. Nothing in the 911 call suggests otherwise.

In any event, as the Government noted in its opening brief, Gonzalez's in-court testimony that she heard the defendant's voice arguing with another man and heard the other man say that he would get the defendant his money is still incredibly damning evidence of the defendant's guilt, both because it independently suggests that the defendant was arguing with someone over money in the exact place that the murder later occurred, and also because it corroborates the significant inculpatory testimony provided by Simmons, Saleh, and Beharovic about the defendant and Sal fighting over money leading up to the murder. (*See, e.g.*, Tr. 121, 216, 454).

 e. <u>Saleh's Testimony Was Credible and the Purported Inconsistencies are Immaterial</u>

David Saleh offered damning evidence at trial about a fight between the defendant and Sal on the day of the murder and statements made by the defendant after the murder. (Tr. 127-221). Defense's efforts to challenge that testimony are unavailing. First, defense takes issue with Saleh's testimony that he called 911 after hearing a woman shouting that someone had been shot. (Def. Br. at 8). Defense argues that it is not plausible that Saleh would have known that the shooting took place at 868 Faile Street based on what this woman was yelling. But Saleh did not testify that he knew or surmised the location of the shooting simply based on the fact that the woman was

yelling about a shooting.  While Saleh did not explain during his testimony how he learned the

location of the shooting, it was obvious that he learned that fact somehow.[3]  Saleh's specific and

credible testimony about what he saw and heard that day should not be discredited simply because

he did not explain how he learned the location of the shooting. Moreover, the testimony at trial

established that Saleh was in possession of information from which he could have concluded that

a murder would have been committed by the defendant at 868 Faile Street: he heard the defendant,

who Saleh knew carried a gun, threaten to kill Sal earlier that day.

Defense also takes issue with the fact that Saleh testified that he called 911, but no record

of Saleh's purported 911 call has been introduced into evidence.  (Def. Br. at 9).  But in addition

to testifying that he called 911, Saleh also testified that he called the 41st Precinct, and specifically

Detective Zafar, to report what he saw and heard that day.[4]  The fact that Saleh called Detective

Zafar to report what he knew about the murder was corroborated at trial by Detective Zafar in

*unchallenged* testimony.[5]   It is entirely possible that Saleh was misremembering and/or confused

---

[3] There were repeated instances during Saleh's testimony where questions needed to be re-asked of Saleh and/or his answers needed to be repeated.  And Saleh's demeanor in Court – and the fact that he testified pursuant to a subpoena – suggested that he was anxious about testifying.  As a result, certain unnecessary details that might have otherwise been elicited during Saleh's testimony were glossed over.

[4] *See* Tr. 221; 9-15 (direct testimony): "Q. Who did you call? A. 911.  Q. Did you call anyone else? A. The precinct. Q. When you say 'the precinct,' what precinct are you referring to? A. The 41 Precinct."

*See also* Tr. 230; 19-21 (cross-examination): "Q. Did there come a point in time where you spoke to any particular person from the NYPD about what you saw or heard? A. I believe it's Tony or Detective Zafar.".

[5] *See, e.g.,* Tr. 482; 12-14: "I remember receiving a phone call from a source known as David Saleh.  The source stated that he knew who committed the murder, and he told me that G was the one responsible."

The defense did not cross-examine Detective Zafar at trial.  (Tr. 487; 13).

about calling 911 *in addition* to calling Zafar.  That confusion and/or lack of memory does not in any way suggest that his other specific memories about what he saw that day were fabricated or mistaken.

Defense's other critiques of Saleh's testimony are equally meaningless.  Defense notes that there is no evidence that Saleh was interviewed by detectives investigating Sal's murder.  (Def. Br. at 8-9).  But the fact that the NYPD may have failed to follow up on the tip from Saleh to Zafar does not mean that the tip was not made.  And the video surveillance camera showing the defendant and another individual entering 743 Hunts Point Avenue after the murder still corroborates Saleh's testimony that the defendant entered Saleh's deli after the murder, even if the defendant entered Saleh's deli alone and not with another individual.

Finally, while Saleh could not identify the defendant in Court—more than 8 years after the murder – Saleh was able to identify the defendant in the photograph taken on the day of the murder. (Tr. 199).  Saleh's identification of the defendant's photograph from the day of the murder and his identification of a photograph of the victim are the identifications that matter.  Those identifications corroborate Saleh's testimony that he saw the defendant and the victim arguing on the day of the murder, and that he often saw them selling drugs together in the neighborhood.  If anything, the fact that Saleh did not identify the defendant in court only contradicts defense's suggestion that Saleh was untruthful in his testimony.  To the contrary, Saleh was truthful about what he saw and did not see and about what he knew and did not know.

* * *

For the reasons explained in its opening brief and further addressed above, the Government has established by at least a preponderance of the evidence that the defendant murdered Sal.  Defense's attempts at poking holes at minor details of the witness testimony simply cannot

overcome the overwhelming nature of that testimony.  One witness saw the defendant commit the crime; other witnesses observed or heard the defendant and Sal in a fight over money immediately before the defendant shot him dead.  These witness accounts all corroborate each other, as does the objective non-witness testimony.

## II.    The Government Has Met Its Burden with Respect to the Applicable Drug Quantity and Other Enhancements

The Government has met its burden of showing by a preponderance of the evidence the amount of heroin and cocaine attributable to Morris during the relevant period from 2012 to 2023. The Government has also established that the "criminal livelihood" and "maintaining a premises" in furtherance of the drug conspiracy also apply.

### a.    The Government Has Met Its Burden as to Amount of Heroin and Cocaine Attributable to the Defendant

The Government met its burden of showing by a preponderance of the evidence the amount of heroin and cocaine attributable to Morris during the relevant period from 2012 to 2023.  The defense complains that the Probation Department's calculation was faulty because it relied on Beharovic and Simmons' testimony about their drug purchases from Morris and his co-conspirators.  (Def. Br. 9-10).  But the Second Circuit has approved the reliance on witness statements to prove drug quantity.  *See United States v. Cotto*, No. 21-2791-CR, 2023 WL 2027277, at *2 (2d Cir. Feb. 16, 2023) (affirming district court's finding that jury's drug weight determination was based on more than "sufficient evidence," which primarily consisted of witness testimony).  As discussed in the Government's opening brief, there was ample evidence at the trial about the Morris DTO's drug trafficking sales, including witness testimony from Simmons, Beharovic, Saleh, Rivera, law enforcement officers, and evidence of drug seizures at 868 Faile Street.  At the *Fatico* hearing, Gonzalez testified about seeing the defendant selling drugs and in her prior statements to law enforcement, Gonzalez also told law enforcement that she saw the

defendant selling drugs at 868 Faile Street. (Hearing Tr. 39; *see also* 3511-05 at 1). The Government also offered evidence of the victim's arrests for selling cocaine and heroin near 868 Faile Street; and the victim's statements to Detective Zafar about selling drugs for the defendant were additional evidence of drug weight attributable to the defendant. The defendant in his 2016 Post Arrest Statement admitted that the victim sold drugs for him. (*See* GX Fatico-6). The Probation department was entitled to rely on this evidence when making its drug calculation.

Specifically, as to heroin, the Probation department found that the defendant was responsible for approximately 8,060 grams of heroin from 2012 to 2023.[6] In reaching its calculation, the Probation department relied on Beharovic's testimony that he purchased 10 glassines per week for 11 years from 868 Faile Street, amounting to 286 grams. (Tr. 438-445; PSR ¶ 38). Probation then concluded that if Beharovic's purchases amounted to 10% of the heroin sales attributable to the defendant, then the total amount of heroin attributable to the defendant would equal 8,060. (PSR ¶ 38). While this calculation is (mathematically) incorrect,[7] it is a reasonable inference that the defendant and his co-conspirators would have conservatively sold at least 8,060 grams of heroin between 2012 and 2023. Holding the defendant responsible for 8,060 grams of heroin over an 11-year period is not an "inferential leap." Rather, that quantity of heroin is a conservative estimate when accounting for all of the evidence in the record, including the defendant's own admission to selling "dope," meaning heroin and that Sal sold heroin and crack on his behalf, as well as the other witness testimony about Morris and his co-conspirator's drug

---

[6] In its initial submission, the Government included in its calculation for the heroin drug weight, Mr. Beharovic's testimony that he purchased two bundles a day between 2010 and 2012 from 868 Faile Street. The Government notes that the defendant was incarcerated between from 2001 to May 2012, and thus, the relevant period should be from 2012 to 2023.

[7] If Beharovic's purchase of 286 grams of heroin accounted for 10% of the heroin sold by the Morris DTO, then the total amount sold would be 2,860 grams. (*See* PSR ¶ 38).

sales.  (*See* GX Fatico-4-T at 56, 76-78; GX Fatico-6).  The Government's burden at sentencing is simply by a preponderance of the evidence, and the Probation Department's calculation is based on reasonable inferences meeting that lower standard of proof.

The defense argues that Beharovic's testimony that he only purchased heroin from the defendant once in 2016 or 2017, and that there's no evidence of the defendant joining the conspiracy before then.  (Def. Br. at 11).  This argument ignores other evidence in the record. Beharovic testified that he began purchasing heroin from individuals who would become co-conspirators of Morris in 2010, (Tr. 442-443) and Simmons testified that she and her partner began purchasing drugs from the defendant and others in the conspiracy in 2013.  (Tr. 114, 162).  Drug sales from the other members of the Morris DTO were foreseeable to the defendant as he was the leader of the organization and therefore those sales are attributable to him.  *See United States v. Felder*, 214 F. Supp. 3d 220, 228 (S.D.N.Y. 2016), aff'd, 760 F. App'x 74 (2d Cir. 2019) (When a defendant "has not directly and personally participated in the underlying drug transactions, then the government must prove that the drug type and quantity were 'at least reasonably foreseeable to the . . . defendant.'"); *see also United States v. Andino*, 627 F.3d 41, 47 (2d Cir. 2010) ("Under 21 U.S.C. § 846, the government need not prove foreseeability of drug type and quantity to the extent that it seeks to hold a defendant accountable for drug transactions in which the defendant directly and personally took part.").  The defense also argues that not all Beharovic heroin purchases were from 868 Faile Street.  Again, the defense ignores the evidence in the record. Beharovic specifically testified that he purchased two bundles five times per week from 868 Faile Street.  (Tr. 438-439).

As to the crack cocaine weight, Probation found that the defendant was responsible for 1,300 grams of cocaine. (PSR ¶ 38).  The defense argues that that calculation is based on Simmon's

testimony. (Def. Br. at 11). But this argument is also incorrect. The defense ignores the defendant's own statements in his 2016 and 2024 Post Arrest Statements, the victim's arrest records showing that he was arrested with crack and heroin near 868 Faile Street, Detective Zafar's testimony that the victim told him that he was selling drugs for the defendant, and the drug seizures that occurred at 868 Faile Street. (GX Fatico-4-T at 56, 76-78; GX Fatico-6; GX Fatico-7A, 7B, 7C, 7D; Tr. 479). Critically, the defense ignores, the 2024 jail call between the defendant and Linda Morris, his mother and co-conspirator, where Linda Morris admits to cutting up and smoking many grams of crack. That statement corroborates Simmons' testimony that Linda Morris smoked crack, was a member of the conspiracy that the defendant led and easily supports the finding that the defendant was responsible for at least 1,300 grams of crack.

      b.   <u>The Government Has Established that the "Maintaining a Premises" and "Criminal Livelihood" Enhancements Apply</u>

The Government has met its burden by a preponderance of the evidence that the enhancements for "maintaining a premises" for the purpose of manufacturing or distributing a controlled substance and the "criminal livelihood" should apply pursuant to U.S.S.G. § 2D1.1(b)(12) and § 2D1.1(b)(16)(E) if the Court does not find the defendant murdered Sal.[8]

First, the evidence at trial demonstrated that the defendant was a leader of the narcotics conspiracy, which operated out of, among other places, the vacant fourth floor apartment. The

---

[8] The defense argues that the Government urged the Court to apply these enhancements "for the first time" in its brief, and therefore that the arguments are "forfeited." (Def. Br. at 13). Putting aside whether advocating for a proper application of the Sentencing Guidelines can ever be "forfeited," since the PSR concluded that the murder cross-reference applied and did not reach the question of these other enhancements, it is not clear to the Government when it should have first "urge[d]" the Court to apply these enhancements if not in the Government's sentencing submission. Nonetheless, as a factual matter, the Government did inform Probation in advance of the draft PSR that it was the Government's position that, if the murder cross-reference did not apply, both of these enhancements should apply.

defendant's controlling interest in that apartment was demonstrated when the defendant entered the locked fourth-floor apartment through the front door, while Rivera had to enter through the window. (Tr. 306; 315-16). The defendant's control of the fourth-floor apartment was also demonstrated when its occupants called the defendant immediately upon Rivera entering, and when the defendant threatened Rivera with a firearm for intruding in his space. (Tr. 331; 15-16).

Next, the enhancement at § 2D1.1(b)(1)(E) applies where the defendant receives an aggravating role adjustment pursuant to § 3B1.1 and "committed the offense as part of the pattern of criminal conduct engaged in as a livelihood." As noted in the Government's initial brief, the testimony at trial from Simmons, Saleh, Rivera, and Beharovic, establish that the defendant sold drugs to make a living. There is no evidence that the defendant had another job during this period of time, nor does he profess consistent work in the PSR. (*See* PSR ¶¶ 91-93). The defense argues that there is no evidence establishing that the defendant derived income exceeding 2,000 times the hourly federal minimum wage, as required for the application of the enhancement by a comment to U.S.S.G. § 4B1.3. Simmons' testified that she and her partner purchased on average $400 to $500 worth of crack from the defendant and his conspirators on a weekly basis from about 2013 to 2022. (Tr. 162; 18). The federal minimum wage between 2013 and 2022 was $7.25 per hour.[9] Thus, Simmons and her partner alone purchased, conservatively, $20,000 to $25,000 worth of crack for almost the entire relevant period of the conspiracy—a range far greater than the $14,500 required for the enhancement to apply.

### III.    A 27-Year Sentence is Appropriate

---

[9] *See* U.S. Department of Labor, Changes in Basic Minimum Wages in Non-Farm Employment Under State Law: Selected Years 1968 to 2024, *available at* https://www.dol.gov/agencies/whd/state/minimum-wage/history (last visited July 28, 2025).

As detailed in the Government's brief, in light of the seriousness of the offense and the defendant's criminal history, the Guidelines sentence of 27 years is necessary and appropriate. The defendant murdered a man in the middle of a busy apartment building, in the middle of a summer day, over a drug debt. The defendant committed this murder just a few years after serving an 11-year sentence for another attempted murder in which he fired a gun at his robbery victim. And he committed the murder in furtherance of a drug conspiracy that he led almost immediately after being released from prison on the attempted murder. On the day of the murder, the defendant was arrested and spent a year in jail in connection with an unrelated parole violation. On these facts, a Guidelines sentence of 27 years – which would be even higher if not for the operation of the statutory maximum sentence with respect to Count Four – is entirely appropriate. Defense's arguments in favor of mitigation are unavailing.

a.   The Defendant's Life Circumstances Do Not Justify a Seven-Year Sentence

In arguing for the mandatory minimum sentence of 7 years' imprisonment, the defendant cites a difficult upbringing with drug-addicted parents and spending most of his childhood in the foster care system. He also points to his substance abuse and mental health issues, as well as the five years he spent in solitary confinement during his 13-year term of imprisonment for attempted murder. While the Court should consider these facts, they do not justify the seven-year sentence sought by the defendant.

The defendant spends much time arguing about his time in solitary confinement (*see* Def. Br. at 14-18), but the reason he spent so much time is solitary confinement is because of the numerous infractions that the defendant incurred during his incarceration—these are aggravating, not mitigating circumstances. Those infractions included fighting, drug use, harassment, smoking, a movement violation, an unauthorized exchange of prison contraband, littering, violent conduct, creating a disturbance, assault of another inmate, smuggling, damaging property, interference,

obstructing visibility, threats, drug possession, and failure to follow direct orders. (PSR ¶ 58). Even after being released from prison, the defendant had his parole revoked and continued to commit crimes, including the instant murder, threats with a firearm, drug trafficking, and thefts. (PSR ¶ 60-61). A 27-year sentence is necessary not only to mete out just punishment, but also to deter the defendant from committing other crimes. The defendant clearly has not been rehabilitated by shorter sentences, including his 13-year term of imprisonment, and thus only a lengthy sentence like the Government seeks will assure the safety of the community.

      b. The Conditions of Confinement Do Not Justify a Seven-Year Sentence

The conditions of the defendant's pretrial detention at the MDC do not justify a variance. While the Court can and should take these circumstances into account in fashioning an appropriate sentence, MDC conditions do not justify the variance the defendant seeks. *See United States v. Mejias*, 24 Cr. 149, Dkt. No. 25, Sent. Tr. at 17-18, (LJL) (S.D.N.Y. Aug. 7, 2024) (expressing skepticism about the relevance of the conditions at the MDC to the incapacitation and public safety elements of the purposes of sentencing). And while a number of courts in this District have previously found that the conditions at the MDC needed significant improvement, the MDC has over recent months taken serious steps to address those issues and has steadily improved conditions, increasing staffing levels and addressing persistent medical issues.

Indeed, this Court, who approximately 18 months ago described the conditions at the MDC as "dreadful," recently recognized the MDC's much-improved conditions. *United States v. Chavez*, 22 Cr. 303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024). More specifically, this Court recently observed that "staffing is up to 75 percent, the medical services staff is significantly higher and fully staffed among nurses, the incidents of violence went from 42 in December . . . to only nine in April" (a 78% decrease in violence). *United States. v. Reshard*, 24 Cr. 392, Dkt. No. 38, Sent. Tr. at 24, (JMF) (S.D.N.Y. May 14, 2025). Other judges have also noted the improved

conditions, including Judge Caproni who wrote that the "MDC is improving every day." *United States v. Villamizar*, 24 Mag. 4261, Dkt. No. 6, Tr. 15 (UA) (VEC), (S.D.N.Y. Dec. 10, 2024); *see also United States. v. Alexander*, 24 Cr. 676, Dkt. No. 37, Tr. 125, (VEC) (S.D.N.Y. Jan. 16, 2025) ("The horror stories from a year ago [at the MDC], it's not the [same] facility. They have a lot more staff. . . . They're doing the best they can.").

Moreover, while the defendant complains about the current conditions at the MDC, he was not incarcerated at the MDC in 2020, 2021, or 2022, at the height of the COVID-19 pandemic where there were more frequent lockdowns. And even when defendants were incarcerated at the height of the pandemic, courts have found that the conditions at the MDC did not warrant "significant Guidelines departure[s]" requested by defendants. *See United States v. Stewart*, No. 21 Cr. 42 (WFK), 2023 WL 2599668, at *7 (E.D.N.Y. Mar. 22, 2023); *see also, e.g., United States v. Sanchez*, No. 01 Cr. 74-2 (PAC), 2022 WL 4298694, at *2 (S.D.N.Y. Sept. 19, 2022) (finding, in context of compassionate release motion, that "the difficult—but generalized—prison conditions during the COVID-19 pandemic" do not constitute extraordinary and compelling circumstances for a defendant's release); *United States v. Boynton*, No. 20 Cr. 43 (RPK), 2022 WL 7131927, at *1 (E.D.N.Y. Oct. 12, 2022) (collecting cases to same effect).

## CONCLUSION

On August 11, 2016, the defendant murdered Sal, in the middle of the day, in a busy apartment building, over a drug debt. A witness saw the defendant commit the murder. Multiple witnesses saw and/or heard the defendant in a fight over money. The non-civilian witness testimony corroborates those accounts. None of the defense's arguments overcome this overwhelming evidence. The Government has also established the relevant drug weights and applicable Guidelines enhancements by at least a preponderance of the evidence.

In light of the seriousness of the offense, the need to provide just punishment and afford adequate specific and general deterrence, and in order to protect the public from further crimes of the defendant, a Guidelines sentence of 27 years' imprisonment is sufficient but not greater than is necessary to comply with the purposes of sentencing.

Dated: New York, New York
      July 29, 2025

                                       Respectfully submitted,

                                       JAY CLAYTON
                                       United States Attorney for
                                       the Southern District of New York

                  By:   _____

                                         Camille L. Fletcher
                                       Matthew Weinberg
                                       Assistant United States Attorneys
                                       (212) 637-2383/2386

cc:    All Counsel